



Office of the Secretary of State
Building 1 Suite 157-K
1900 Kanawha Blvd E
Charleston, WV  25305

9171 9237 9000 1000 1747 44

**Natalie E. Tennant**
Secretary of State
Telephone: 304-558-6000
Toll Free: 866-SOS-VOTE
www.wvsos.com

|  |  |
|---|---|
| ControlNumber: | 286855 |
| Defendant: | Monsanto Company |

Monsanto Company
Corporation Service Company
209 West Washington Street
Charleston WV  25302

|  |  |
|---|---|
|  | 11/24/2009 |
| Civil Action: | 09-C-235 |

I am enclosing:

| | | | |
|---|---|---|---|
| \_\_\_\_ summons | \_\_\_\_ affidavit | 1 summons and complaint |
| \_\_\_\_ notice | \_\_\_\_ answer | \_\_\_\_ summons returned from post office |
| \_\_\_\_ order | \_\_\_\_ cross-claim | \_\_\_\_ summons and amended complaint |
| \_\_\_\_ petition | \_\_\_\_ counterclaim | \_\_\_\_ 3rd party summons and complaint |
| \_\_\_\_ motion | \_\_\_\_ request | \_\_\_\_ no return from post office |
| \_\_\_\_ suggestions | \_\_\_\_ certified return receipt | \_\_\_\_ notice of mechanic's lien |
| \_\_\_\_ interrogatories | \_\_\_\_ request for production | \_\_\_\_ suggestee execution |
| \_\_\_\_ original | \_\_\_\_ request for admissions | \_\_\_\_ Other |
| \_\_\_\_ subpeona duces tecum | | |

which was served on the Secretary at the State Capitol as your statutory attorney-in-fact.  According to law, I have accepted service of process in the name and on behalf of your corporation.

*Please note that this office has no connection whatsoever with the enclosed documents other than to accept service of process in your name and on behalf as your attorney-in-fact.   Please address any questions about this document directly to the court or the plaintiff's attorney, shown in the enclosed paper.  Please do not call the Secretary of State's office.*

*Sincerely,*

Natalie E. Tennant
Secretary of State

EXHIBIT 1

SUMMONS

## IN THE CIRCUIT COURT OF PUTNAM COUNTY, WEST VIRGINIA

| | |
|---|---|
| NANCY AGEE, | }     CIVIL ACTION NO.: 09-C-235 |
|               Plaintiff, | } |
| | }  SERVE: |
| | } |
| v. | }  Monsanto Company |
| | }  c/o Corporation Service Company |
| MONSANTO COMPANY, | }  209 West Washington Street |
| PHARMACIA CORPORATION, | }  Charleston, West Virginia 25302 |
| FLEXSYS AMERICA CO., | } |
| FLEXSYS AMERICA L.P., | } |
| APOGEE COAL COMPANY, LLC, | } |
| SOLUTIA, INC. | } |
|            Defendants | } |

**To the above-named Defendant:**

    IN THE NAME OF THE STATE OF WEST VIRGINIA, you are hereby summoned and required to serve upon, Stuart Calwell, plaintiff's attorney, and The Calwell Practice, PLLC, whose address is 500 Randolph Street, Charleston, West Virginia 25302, an answer, including any related counterclaim you may have, to the complaint filed against you in the above-styled civil action, a true copy of which is herewith delivered to you. You are required to serve an answer within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for relief demanded in the complaint and you will be thereafter barred from asserting in another action any claim you may have which must be asserted by counterclaim in the above-styled civil action.

Dated: _8 - 3 - 2009_       _Ronnie W. Matthews_

                                           Clerk of Court

## IN THE CIRCUIT COURT OF PUTNAM COUNTY, WEST VIRGINIA

NANCY AGEE,

    **Plaintiff,**

v.          Civil Action No.: $\underline{09-C-235}$

MONSANTO COMPANY,
PHARMACIA CORPORATION,
FLEXSYS AMERICA CO.,
FLEXSYS AMERICA L.P.,
APOGEE COAL COMPANY, LLC,
and SOLUTIA INC.

    **Defendants,**

### COMPLAINT

1. The Plaintiff, Nancy Agee, by and through her counsel, Stuart Calwell and The Calwell Practice, PLLC for her complaint alleges and states as follows:

2. The Plaintiff claims that her cancer was caused by exposure to dioxins/furans contamination of the air and property in and around Nitro, West Virginia; Plaintiff alleges the same series of occurrences involving the negligent and otherwise unlawful release of dioxin from Defendants' waste disposal practices on properties owned and/or controlled by the Defendants located in and about Nitro, West Virginia, caused her to develop or significantly contributed to her developing cancer. Plaintiff's claims are based entirely on the Defendants' disposal practices regarding dioxins/furans contaminated wastes.

3. Plaintiff is a resident and/or former resident of Nitro, West Virginia, and/or one or more of several communities surrounding a now defunct chemical plant located near Nitro, West Virginia, and/or worked, and/or attended school in Nitro, West Virginia, and/or one or more of

several communities surrounding the now defunct Monsanto chemical plant located in Nitro, as will be more particularly shown below.

4.     The former Monsanto Company (hereafter Old Monsanto) owned and operated the plant from approximately 1934 to approximately 2000. Beginning in 1949 and continuing through 1970 Old Monsanto produced at the plant site a commercial, agricultural herbicide, 2,4,5 – trichlorophenoxyacidic acid (hereafter 2,4,5-T), which was heavily contaminated with dibenzo dioxins and dibenzo furans including 2,3,7,8 tetrachlorodibenzoparadioxin (hereafter collectively dioxins/furans). Beginning in 1949 and thereafter at all relevant times the Defendants began to dispose of dioxin-contaminated waste generated by the aforementioned process in a manner which caused dioxins/furans to escape into the atmosphere contaminating the air in and around the areas where the Plaintiff lived.

5.     Plaintiff brings this action against the defendants and each of them for directly causing Plaintiff to develop cancer as a result of their waste disposal and waste management practices related to the aforementioned dioxin-contaminated material.  Plaintiff further brings this action against the above-named defendants and each of them as successors to the dioxins/furans related legacy liabilities of the Old Monsanto Company's Agricultural Division for causing Plaintiff's cancer and/or for causing the air and property to become contaminated with the aforesaid dioxins/furans, as a result of their waste disposal practices related to dioxin-contaminated material.

6.     As a result of the aforesaid dioxins/furans contamination, the Plaintiff was caused to breathe dioxins/furans-contaminated air, touch dioxins/furans-contaminated soil, live in dioxins/furans-contaminated homes, and ingest dioxins/furans during the entire time Plaintiff lived, worked, or attended school in the dioxins/furans-contaminated areas.

7.     As a direct and proximate result of the aforesaid exposures Plaintiff contracted one or more cancers known to be caused and/ or promoted by exposure to dioxins/furans.

## JURISDICTION

8.     The Circuit Court of Putnam County has jurisdiction to decide this lawsuit. The complained of events originated with the defendants' plant site, the aforesaid "Monsanto Plant", near Nitro, Putnam County, West Virginia.

9.     The Plaintiff has been directly injured and damaged as a direct consequence of the aforesaid airborne dioxins/furans leaving the Nitro Plant and other waste disposal locations, and entering the Plaintiff's home and property, and/or schools and/or workplaces in the Nitro area where Plaintiff spent significant periods of time.

## IDENTITY OF THE PARTIES

10.     Plaintiff is a resident and/or former resident of Nitro, West Virginia, and/or one or more of several communities surrounding the former location of the Old Monsanto plant in Nitro, West Virginia, and/or worked, and/or attended school in these areas.   Plaintiff has been diagnosed with cancer.

## DEFENDANTS

11.     The defendant, Monsanto Company, is a corporation, with its principal place of business in the State of Missouri.

12.     The defendant, Pharmacia Corporation, is a corporation, with its principal place of business in the State of New York.

13.     The defendant, Flexsys America Co., is a corporation, with its principal place of business in the State of Ohio.

14.    The defendant, Flexsys America, L.P. is a corporation, with its principal place of business in the State of Ohio.

15.    The defendant Apogee Coal Company, LLC (the "coal company defendant") is a West Virginia corporation with its principal place of business in the State of West Virginia.

16.    The defendant Solutia Inc. is a corporation with its principal place of business in St. Louis, Missouri.

17.    At all relevant times the defendants were doing business in Putnam County and Kanawha County, West Virginia.

## THE LEGACY OF "OLD MONSANTO"

18.    Because the Defendant, Monsanto, is a "new" company, and because certain defendants, including "New Monsanto" are liable for the unlawful conduct of "Old Monsanto" a brief recitation of the history of these two relatives is necessary.

19.    Old Monsanto was created soon after the turn of the last century and operated continuously either as the Monsanto Chemical Company or simply as the Monsanto Company, until its pupation into one or more of the herein named defendants sometime during and after approximately 1997.

20.    Prior to September 1, 1997, Old Monsanto's organization included three divisions: the Agricultural Products Division (or some similar name), the Pharmaceuticals and Nutrition Division (or some similar name) and the Chemical Products Division (or some similar name).

21.    Old Monsanto acquired its Nitro plant from Rubber Services Industries sometime in the late 1920's or early 1930's with the intention of supplying rubber chemicals to the tire industry in Akron, Ohio, and elsewhere.

22.     Old Monsanto's Nitro plant was primarily a Chemical Products Division plant. But the Nitro plant was also home to one of Old Monsanto's Agricultural Division's products. More particularly, Old Monsanto's Agricultural Division produced, as aforesaid, the phenoxy herbicide at its Nitro plant known as 2, 4, 5,-T from 1949 through 1971.

23.     The workers who manufactured this herbicide referred to it simply as "weed bug". All "weed bug" manufactured by Old Monsanto was heavily contaminated with the aforesaid dioxins/furans.

## OLD MONSANTO'S KNOWLEDGE REGARDING DIOXIN

24.     In the late 1940's Old Monsanto's Nitro plant was housed in buildings and sheds constructed by the United States Government in 1917-1918 as part of a nitro-cellulose (gunpowder) plant to produce munitions for World War I.

25.     Plant structures were nothing more than a series of open-ended sheds and brick parapet walls scabbed together to provide a roof over the giant cooking pots and other paraphernalia used in the production of basic chemical products.

26.     In approximately 1947, Old Monsanto's Agricultural Division began to produce on an experimental scale a molecule, that in its logically pure form was known as 2, 4, 5,-trichlorophenoxyacidic acid, or the aforesaid 2, 4, 5,-T.  This molecule exhibited toxicity to plants by causing their root systems to outgrow their leaf systems, thus causing the plant to destroy itself through a process of defoliation.

27.     In 1949, Old Monsanto's Agricultural Division "started up" its 2, 4, 5,-T manufacturing process at the Nitro plant.  At that time and continuing through the early sixties Old Monsanto produced 2, 4, 5,-T in a "batch" process at the Nitro plant.  This simply meant that batches of the product were cooked (reacted) as opposed to a continuous production stream.

Large pots (autoclaves) were loaded with precursor chemicals, which were allowed to react (cook) to form the 2, 4, 5,-T molecule.

28.    In 1949, a reaction in one of the 2, 4, 5,-T autoclaves went out of control. Heat and pressure built and a safety disk blew open, discharging the contents of the vessel to the atmosphere through the roof of building 34. A large cloud drifted over the plant and over the town. 226 plant workers became ill. Some were sent to the University of Cincinnati's Kettering Institute to be examined by Dr. Raymond Suskind. In three confidential reports to Old Monsanto dated 1949, 1952 and 1953, it was reported that the "unknown products of decomposition" liberated from the 2, 4, 5,-T autoclave caused a systemic intoxication in the workers involving most major organ systems, the endocrine system, the nervous system (both central and peripheral) and further resulted in a systemic acne dubbed "chloracne". The affected workers at the plant referred to the acne simply as "weed bumps".

29.    In 1957, two German scientists, Kimmig and Schultz, published the findings of research into the "unknown toxic by-products" of chlorinated benzene processes. They identified the toxin as dioxin, a molecule another German had patented in the 1890's. The technology of gas chromatography permitted the identification of the dioxin molecule and it was determined that it was this toxin that was the culprit in Old Monsanto's Nitro 1949 release.

30.    From 1949 until 1971, Old Monsanto's Agricultural Division produced 2, 4, 5-T on a continuous basis in its trichlorophenol plant in Nitro. Each and every ounce and each and every molecule of this product had associated with it the contaminants, the aforesaid dioxins/furans.

31.    The production of dioxin contaminated 2, 4, 5,-T continued 7 days a week 365 days a year from 1949 to approximately 1971 at the Monsanto Nitro plant. During this entire

time period, dioxin-contaminated wastes were burned, 7 days a week, in an open 20 feet by 40 feet pit on the plant site as well as at off-site dumps – including at least one dump site owned and or controlled by the coal company defendant -- causing dioxin/furans-contaminated particulate matter to contaminate the air and property in Nitro and surrounding area.

32.    In approximately 1972, Old Monsanto dismantled the 2, 4, 5,-T building and buried it, due to its dioxins/furans contamination, on the plant site.

33.    At all times relevant, Old Monsanto and the herein named defendants had actual knowledge of the dioxins/furans contamination problem at Nitro and the surrounding communities and in the alternative certain of the defendants knew or with the exercise of reasonable care should have known of the aforesaid contamination.

## SOLUTIA, INC.

34.    Solutia, Inc. (hereafter "Solutia"), was incorporated in April 1997 by Old Monsanto corporate insiders.  Solutia is simply the renamed Queeny Chemical Company[1], a subsidiary of Old Monsanto.

35.    On or about September 1, 1997, Old Monsanto entered into a Distribution Agreement with Solutia, which transferred the operations, assets and liabilities of Old Monsanto's Chemicals Division to Solutia.

36.    In connection with the aforesaid distribution to Solutia, Old Monsanto distributed on a one to five basis all of the stock of Solutia to Old Monsanto shareholders (the "spinoff").

37.    Solutia was created by Old Monsanto insiders as the vessel into which Old Monsanto and the named defendants sought to concentrate their liabilities arising from the

---

[1] The Queeny Plant and Old Monsanto had their beginnings simultaneously in 1901.  John Francis Queeny and Dr. Louis Veillon launched these enterprises simultaneously, naming Monsanto after John Queeny's wife Olga Monsanto Queeny.

environmentally ruinous historical conduct of Old Monsanto at its various Chemicals Division operations throughout the United States, including Nitro, West Virginia.

38.     On information and belief, Solutia agreed to assume Old Monsanto's Chemicals Division legacy liability because at the time Solutia was being controlled by former Old Monsanto corporate insiders.

39.     Old Monsanto did not, however, transfer all operations, assets and liabilities to Solutia.   The so-called agriculture business was not transferred.   The pharmaceutical and nutrition businesses were, likewise, retained by Old Monsanto.

40.     As aforesaid, the Nitro plant was part of the chemicals division and was distributed to Solutia. After the distribution, Solutia was an owner and/or controller of the Nitro plant premises, and during such time, the Flexsys defendants operated the plant's facilities.

41.     Upon information and belief, following a brief six-year "effort" by Solutia to operate plants in 18 areas of the United States, Solutia  and 14 of its corporate affiliates filed petitions for relief under chapter 11 of title 11, United States Code (the Bankruptcy Code) in the United States Bankruptcy Court for the Southern District of New York.  Solutia emerged from bankruptcy on or about February 28, 2008.

## MONSANTO COMPANY

42.     The defendant Monsanto Company (hereinafter New Monsanto), is the successor in interest to the liabilities of Old Monsanto.

43.     New Monsanto was incorporated in February 2000 as a subsidiary of the defendant, Pharmacia Corporation ("Pharmacia"), under the name Monsanto Ag Company.

44.     On March 31, 2000, New Monsanto changed its name from "Monsanto Ag Company" to "Monsanto Company".

45.     On September 1, 2000, Pharmacia transferred the assets and liabilities of its agricultural business to New Monsanto pursuant to the terms of a Separation Agreement.

46.     On October 23, 2000, New Monsanto sold 38,033,000 shares of its common stock in an initial public offering at a price of $20 per share. Pharmacia continued to own the remaining shares, representing 85.2% of the outstanding shares.

47.     On August 13, 2002, Pharmacia spun off its remaining interest in New Monsanto by distributing its entire ownership of New Monsanto stock to Pharmacia shareholders by means of a tax-free dividend. The stated reasons for the separation of the agricultural business from the other businesses of Pharmacia were that as a separate company, the agricultural business could have a more focused investor base, greater strategic focus and the ability to offer better incentives to employees.

48.     Under the terms of the Separation Agreement, New Monsanto agreed to indemnify Pharmacia for any liability it might have for environmental remediation or other environmental responsibilities primarily related to Pharmacia's former agricultural or chemical businesses.

49.     The aforesaid Separation Agreement provided that New Monsanto would indemnify Pharmacia for environmental liabilities that Solutia, the former chemicals business of Pharmacia, assumed pursuant to the aforesaid Distribution Agreement, to the extent that Solutia failed to pay, perform or discharge those liabilities.

50.     On July 1, 2002, in anticipation of the spinoff of New Monsanto, Pharmacia and New Monsanto entered into a First Amendment to the Separation Agreement ("Amendment"). In the amendment, the definition of "Former Agricultural Business" was amended by adding the following language at the end of Schedule F-1 under the heading "Other Former Businesses":

"34.   discontinued   herbicides,   including,   without   limitation,   2,4-D   (2,4 dichlorophenoxyacetic acid) and 2,4,5-T (2,4,5 trichlorophenoxyacetic acid)" (emphasis added). This amendment made it clear that the New Monsanto was keeping its agricultural liabilities. The New Monsanto emerged from the tangle of business deals instigated by Old Monsanto, with Old Monsanto's valuable agricultural assets intact and ostensibly protected from Old Monsanto's Chemicals Division legacy liability.

51.   New Monsanto maintains its principal offices in St. Louis, MO, the same corporate park occupied for decades by the Old Monsanto. New Monsanto rarely refers to its former self by the name "Monsanto", choosing instead to refer to legacy issues in the name of the defendant Pharmacia, a company that did not exist prior to March 31, 2000.

## PHARMACIA CORPORATION

52.   Pharmacia Corporation ("Pharmacia") was originally incorporated under the name Monsanto Company (the successor to a Missouri corporation, Monsanto Chemical Works).

53.   On March 31, 2000, MP Sub, Incorporated, a wholly-owned subsidiary of Pharmacia (then named Monsanto Company), merged with and into Pharmacia & Upjohn, Inc. ("P&U") pursuant to the terms of an Agreement and Plan of Merger dated as of December 19, 1999, among the parties (the "Merger Agreement").

54.   As a result of the merger, each share of common stock of P&U was converted into 1.19 shares of the common stock of Pharmacia, and each share of Series A Convertible Perpetual Preferred Stock of P&U was converted into one share of a new series of convertible preferred stock of Pharmacia designated as Series B Convertible Preferred Stock.

55.   As a part of the aforesaid merger, Old Monsanto was renamed Pharmacia Corporation and P&U became a subsidiary of Pharmacia.

56.     After the merger, the agricultural operations of Pharmacia were transferred to New Monsanto.

57.     On July 13, 2002, Pfizer Inc. ("Pfizer") entered into an Agreement and Plan of Merger (the "Merger Agreement") with Pharmacia and Pilsner Acquisition Sub Corp., a direct wholly-owned subsidiary of Pfizer (the "Merger Sub").

58.     The aforesaid merger was completed on July 16, 2003, at which time the Merger Sub was merged with and into Pharmacia, and Pharmacia survived the merger as a wholly-owned subsidiary of Pfizer.

59.     Each Pharmacia shareholder received 1.4 shares of Pfizer stock for each share of Pharmacia stock, and each share of Pharmacia's Series C convertible perpetual preferred stock was exchanged for one share of Pfizer Series A convertible perpetual preferred stock.

60.     The total estimated purchase price paid by Pfizer was $56 billion.

61.     A condition precedent to Pfizer paying the purchase price was that Pharmacia had to cause one of the following to occur:

       (i)     a spin-off of New Monsanto,

       (ii)    the sale of all or substantially all of the assets of New Monsanto followed by the liquidation and dissolution of New Monsanto, or

       (iii)   the sale of all of Pharmacia's equity interest in Monsanto.

62.     Pharmacia has offices in St. Louis, Missouri.

63.     At all relevant times, Pharmacia and its subsidiaries, owned, occupied, and otherwise controlled the aforesaid contaminated Nitro plant.

64.     Further at all relevant times, Pharmacia was and is a successor to the liabilities of Old Monsanto and Pharmacia has and continues to aid and abet Monsanto in the contamination of the communities surrounding the Nitro plant.

## FLEXSYS AMERICA CO., FLEXSYS AMERICA, L.P.,

65.     The defendants, Flexsys America Co and Flexsys America, L.P., are corporations (collectively "Flexsys").

66.     Each of these defendants maintains its principal place of business in the State of Ohio and at all times relevant each of the defendants, Flexsys, were licensed to do business in the State of West Virginia and were doing business in the State of West Virginia.

67.     The defendants, Flexsys, are and were created by Flexsys NV, an incorporated joint venture existing under and by virtue of the laws of Belgium, formed in 1995 between Akzo Nobel NV and Old Monsanto, and maintaining a principal place of business in Woluwe, Belgium.

68.     The defendants, Flexsys, were formed for the purpose of carrying out various complex business ventures with the other defendants as more particularly appears below.

69.     At relevant times, the defendants, Flexsys, were in joint ventures with Old Monsanto and at relevant times were in joint ventures with the other defendants, including Pharmacia and New Monsanto, for the purpose, but not limited thereto, of operating and controlling the Old Monsanto Nitro plant near Nitro, West Virginia.

70.     To carry out the aforesaid joint venture, Akzo and Old Monsanto entered into a "Master Operating Agreement" and certain amendments thereto as of January 1, 1995.   The Master Operating Agreement provided that Flexsys was to be the operator of the Nitro plant providing services to Solutia, as guest, at Nitro.

71.    At various and relevant times Flexsys owned, operated or had control of the Nitro, West Virginia, plant site. During these times the defendants, Flexsys, knew and had reason to know of the aforesaid dangerous dioxin contamination existing at the Nitro plant site and further knew or had reason to know that dioxin contamination was leaving the plant site causing the communities in the surrounding area to become contaminated with dioxin and other related toxins.

72.    At all relevant times the defendants, Flexsys, had control of, operated, and otherwise had responsibility for Old Monsanto's Nitro Plant. At all such times, these defendants knew, should have known, and were in a position to know of the risks of contamination and off site contamination presented by the dioxin/furan contaminated environment of the Nitro Plant site. The Flexsys defendants are successors to the liability of Old Monsanto for off-site dioxin/furan contamination with reference to the Nitro site and these defendants are jointly and severely liable with the other defendants.

73.    At all times relevant, the defendants were doing business in the State of West Virginia, at, by and through their chemical plant located on Plant Road, Nitro, West Virginia.

### APOGEE COAL COMPANY, LLC

74.    Defendant Apogee Coal Company, LLC is a West Virginia corporation, with its principle place of business is in Charleston, West Virginia, and upon information and belief, is a successor to the liabilities of certain companies that owned and/or controlled a Manila Creek dump site at relevant times herein where dioxin contaminated wastes from the said Nitro plant were disposed of and burned all with the permission and knowledge of such predecessor companies.

75.    At all relevant times, the defendants each had ownership, possession control and/or the right to control of the dump sites identified herein.

## ALLEGATIONS OF FACT AND CAUSES OF ACTION

76.     Plaintiff incorporates each and every allegation above, and specifically directs the reader to the section "The Legacy of Old Monsanto".

77.     The town of Nitro was built, as were the Nitro plant buildings, during 1917-1918. Bungalows, store buildings, schools and other buildings were constructed all as a part of a government reservation to house munitions plant employees and their families. When the government moved out and the chemical plants moved in, the town became populated with chemical plant workers and their families. Many of the original World War I buildings and houses still exist and are still occupied. Additionally, over the years new houses were built and the population of the river bottom towns of Nitro, Poca, Bancroft and Saint Albans grew as did unincorporated communities around the towns.

78.     During the years that Old Monsanto was operating its trichlorophenol plant, it adopted an unlawful practice of disposing of dioxin waste materials by a continuous process of open "pit" burning. This practice was largely denied by Old Monsanto whose representatives characterized the practice as an "incineration process" when asked by regulatory authorities.

79.     Old Monsanto and its successors in the years following the cessation of 2,4,5-T production (1970 to the present) failed to adequately control the dioxin contaminated soils and other dioxin contaminated waste materials both on and off the plant site. Dioxins/furans continued to be re-deposited and re-distributed from the plant site and the off-site dumps so as to continue the process of air and property contamination.

80.     The non-Monsanto Defendants knew or should have known of the dioxin contamination at the Nitro plant site. These Defendants, jointly, severally, and in concert failed to take affirmative steps to stop the continued escape of dioxins/furans from the aforesaid sites.

Indeed, these Defendants acted carelessly, negligently, recklessly, and/or deliberately in ways to increase the escape of dioxin to the Nitro area as afore-described.

## NEGLIGENCE

81.     Plaintiff incorporates each of the foregoing paragraphs.

82.     Each of the Defendants at all relevant times owed a duty to the Plaintiff, to act with due care in the disposal of dioxin-contaminated materials (and the contamination remaining as a result of prior waste disposal practices) to prevent the contamination of the air and property of Nitro and the surrounding area.

83.     Each of the Defendants at all relevant times knew or in the exercise of reasonable diligence should have known of the highly toxic properties of dioxin and that dioxin was and is a known promoter of cancer and that dioxin was and is a known human carcinogen.

84.     At all times relevant the Defendants, and each of them, knew that the area around the Monsanto plant was populated with permanent residents who would likely live out their lives in the area contaminated by the Defendants' dioxin.

85.     At all times relevant, the Defendants, and each of them, knew that dioxins/furans are slow acting poisons with long latency periods so that detection and causation become difficult and expensive to prove. The Defendants, acting on that knowledge, deliberately allowed the aforesaid area to become dangerously contaminated. The defendants were and are gambling that the passage of time will shield the Defendants and each of them from accountability for their dreadful acts, allowing the Defendants to blame the vagaries of life for the cancer Plaintiff suffers.

86.    At all times relevant, the Defendants, and each of them, as aforesaid, disposed of, or allowed the disposal of, dioxin-contaminated waste in a negligent, careless, reckless and/or deliberate manner and in so doing breached the duties aforesaid owed to the Plaintiff.

87.    As a direct and proximate result of the conduct of the Defendants as aforesaid, but not limited thereto, the Plaintiff has been injured and caused to suffer cancer and as a consequence and have been damaged in ways and in amounts hereinafter set forth.

### *RYLANDS V. FLETCHER* – STRICT LIABILITY

88.   Plaintiff incorporates by reference each and every allegation and paragraph in the foregoing and adopts them as though fully set forth herein in the first instance.

89.    The defendants' disposal of dioxin-contaminated waste was abnormally dangerous within the meaning of *Peneschi v. National Steel Corp, 295 S.E.2d 1 (W.Va. 1982),* which adopted the *Restatement (Second) of Torts 519 and 520 (1976)*[2] definition of "abnormally dangerous", later confirmed in *Bowers v. Wurzburg, 528 S.E.2d 475 (W.Va. 1999).*

90.    As a direct and proximate result of the Defendants activities as aforesaid, poisonous and toxic dust and particulate matter has invaded the property and person of  the

---

[2] 519. GENERAL PRINCIPLE
(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.
(2) this strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.
520. ABNORMALLY DANGEROUS ACTIVITIES
In determining whether an activity is abnormally dangerous, the following factors are to be considered:
     (a)  existence of a high degree of risk of some harm to the person, land or chattels of others;
     (b)  likelihood that the harm that results from it will be great;
     (c)  inability to eliminate the risk by the exercise of reasonable care;
     (d)  extent to which the activity is not a matter of common usage;
     (e)  inappropriateness of the activity to the place where it is carried on; and
     (f)  extent to which its value to the community is outweighed by its dangerous attributes.

Plaintiff and Plaintiff has, therefore been damaged and injured in her person and property as set forth above and more particularly stated below.

**WHEREFORE** the Plaintiff demands judgment of and from the Defendants and each of them in an amount hereinafter prayed for.

## NUISANCE

91.   Plaintiff incorporates by reference each and every allegation and paragraph in the foregoing and adopts them as though fully set forth herein in the first instance.

92.   Private nuisance is solely a matter of tort liability. The interest in the private use and enjoyment of land may be invaded by more than one type of conduct. The invasion may be intentional and unreasonable. It may be unintentional but caused by negligent or reckless conduct; or it may result from an abnormally dangerous activity for which there is strict liability. On any of these bases the defendants may be liable. *Restatement (2d) of Torts Section 822 comment a (1979).*

93.   Plaintiff at all relevant times enjoyed a legally protected interest in the private use and enjoyment of her property. Included within this interest of private use and enjoyment is the interest in enjoying her property without exposure to dioxin contamination sustaining an injury to her person as a result of such exposure. At all times relevant, the defendants invaded Plaintiff's legally protected property interests by causing Plaintiff's property to become contaminated with the aforesaid dioxins/furans, thus injuring the Plaintiff as aforesaid.

### A. Intentional Nuisance - Strict Liability.

94.   Plaintiff incorporates by reference all foregoing paragraphs the same as though each were fully set forth herein verbatim in the first instance.

95.     Since 1949 the defendants by virtue of the actions of Old Monsanto Company and its successor, The Monsanto Company, and the other defendants by virtue of their actions, jointly, severally and as successors to the liability of Old Monsanto Company, created and maintained a nuisance on the property known as the "Monsanto Plant," and other locations referenced herein by disposing of dioxins/furans contaminated waste as aforesaid.

96.     As a result of such waste disposal practices, dioxins/furans escaped from the defendants' property to the lands and property of the Plaintiff.  Plaintiff alleges that the defendants, by their waste disposal practices, intended to cause dioxins/furans to escape to the lands of the Plaintiff.

97.     Because the defendants knew or should have known that their conduct in disposing of dioxins/furans-contaminated as aforesaid and causing dioxins/furans to escape their property and Nitro Plant site would substantially and unreasonably interfere with Plaintiffs' interests in the use and safe enjoyment her property, the defendants' conduct in so doing was and is intentional and unreasonable within the meaning of *Hendricks v. Stalnaker*, 380 S.E.2d 198, 202 (W.Va. 1989), and as such constitutes an intentional and actionable nuisance.

98.     Because of the gravity of the harm to the Plaintiff presented by her exposure to dioxins/furans and subsequent development of cancer outweighs the social value of the defendants' wastes disposal practices, as aforesaid, the defendants' contamination of plaintiff's property by their waste disposal practices is unreasonable.

99.     Because the defendants' conduct, as aforesaid, in interfering with Plaintiff's property interests was and is intentional and unreasonable, the defendants and each of them are strictly liable to Plaintiff for the harm and damages proximately caused thereby.

100. As a direct and proximate cause of the defendants' invasion of the Plaintiff's property with dioxins/furans from defendants' waste disposal practices, the Plaintiff sustained the aforementioned personal injury as a result of the use of her property.

**WHEREFORE**, the Plaintiff demands judgment of and from the Defendants and each of them in an amount hereinafter prayed for.

### B. Unintentional and Otherwise Actionable Nuisance.

101. Plaintiff incorporates all allegations and preceding paragraphs the same as though fully set forth herein in the first instance.

102. In the alternative, defendants' conduct in contaminating Plaintiff's property as a result of their waste disposal practices was unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.

103. Defendants' conduct, as aforesaid, in invading the property interests of the Plaintiff with the aforesaid dioxins/furans was negligent and reckless and as such constituted an actionable nuisance, subjecting defendants to liability for any harm proximately caused by defendants' unlawful invasion of Plaintiff's property.

104. Additionally, and in the alternative to Plaintiff's allegations that defendants' were negligent and reckless, Plaintiff alleges that the disposal of dioxins/furans-contaminated waste is an abnormally dangerous activity within the meaning of *Rylands v. Fletcher* L. R. 3 H. L. 330 (1868) as cited in *Peneschi v. National Steel Corp.*, 295 S.E.2d 1 (W.Va. 1982).

105. The defendants for their own purposes and economic profit chose to dispose of dioxin-contaminated waste by burning such waste in what were essentially bonfires, as aforesaid.

By doing so, the defendants released "poisonous dust" into the air which, as a matter of law constitutes an abnormally dangerous activity.

106.    Because the defendants engaged in an abnormally dangerous activity, the defendants are strictly liable to the Plaintiff for any harm and injury proximately caused by their waste disposal practices.

107.    As a direct and proximate cause of the defendants' invasion of the Plaintiff's property with dioxins/furans from defendants' waste disposal practices, the Plaintiff sustained the aforementioned personal injury as a result of the use of her property.

**WHEREFORE**, the Plaintiff demands judgment of and from the Defendants and each of them in an amount hereinafter prayed for.

### ACTIONABLE TRESPASS

108.    Plaintiff incorporates by reference each and every allegation and paragraph in the foregoing and adopts them as though fully set forth herein in the first instance.

109.    At common law, any act which directly brought foreign matter, whether a human being, an animate or inanimate chattel, or a structure, upon land in the possession of another was redressable in an action of trespass *quare clausum fregit*. The direct causal relation between the conduct of the actor and the intrusion of the foreign matter upon the possessor's land was sufficient to create a trespass.

110.    One who recklessly or negligently, or as a result of an abnormally dangerous activity, enters land in the possession of another or causes a thing or third person so as to enter is subject to liability to the possessor if, but only if, her presence or the presence of the thing or the third person upon the land causes harm to the land, to the possessor, or to a thing or a third

person in whose security the possessor has a legally protected interest. *Restatement (Second) of Torts section 165 (1965)*

111.    The defendants, at all relevant times, recklessly or negligently, or as a result of the abnormally dangerous activity of disposing of dioxin/furans-contaminated waste by burning it in large bonfires, caused the property of the Plaintiff to be invaded by aforesaid dioxins/furans, causing great and substantial harm to Plaintiff's person.

112.    As a direct and proximate cause of the defendants' invasion of the Plaintiff's property with dioxins/furans from defendants' waste disposal practices, the Plaintiff sustained the aforementioned personal injury as a result of the use of her property.

WHEREFORE, the Plaintiff demands judgment of and from the Defendants and each of them in an amount hereinafter prayed for.

## PRAYER FOR RELIEF AND COMPENSATORY DAMAGES

113.    Plaintiff demands judgment of and from the Defendants and each of them in an amount to fairly compensate her for past, present and future medical bills; lost wages; past, present, and future pain and suffering, mental anguish, and loss of enjoyment of life.

WHEREFORE, Plaintiff demands judgment of and from the Defendants and each of them in an amount to fairly compensate him for compensatory damages.

## PUNITIVE DAMAGES

114.    Defendants' actions, or some of them, were undertaken in a willful, wanton, and reckless manner evidencing a callous disregard for the health and wellbeing of the residents of the Nitro area.

115.    Plaintiff is entitled to punitive damages to punish and deter Defendants' for such conduct.

**WHEREFORE,** Plaintiff demands as and for punitive damages in an amount sufficient to deter defendants from future conduct as above set forth.

**JURY DEMAND**

The Plaintiff herein demands a trial by jury.

**NANCY AGEE,**
**By Counsel**

Stuart Calwell (WV State Bar #595)
David Carriger (WV State Bar #7140)
**THE CALWELL PRACTICE PLLC**
**Law and Arts Center West**
**500 Randolph Street**
**Charleston, West Virginia 25301**
**(304) 343-4323**

FUNCTION = CHANGE                                          CASE SCREEN 4
      Case number   09-C-235                    Action Log
            NANCY AGEE               vs. MONSANTO COMPANY
Line    Date                    Action / Results
   1 08/03/09 CASE FILED/SUMS TO ATTY FOR SERVICE TO SOS


 C=Chg   D=Del   1-4=Scr   M=Menu   T=Chg Line#   PgUp PgDn P=Prt A=Add I=Image        _

## IN THE CIRCUIT COURT OF PUTNAM COUNTY, WEST VIRGINIA

NANCY AGEE,

      Plaintiff,

             -v-                           CIVIL ACTION NO.:  09-C-235
                                               (Judge O.C. Spaulding)

MONSANTO COMPANY, PHARMACIA
CORPORATION, FLEXSYS AMERICA CO.,
FLEXSYS AMERICA, L.P., APOGEE COAL
COMPANY, LLC, and SOLUTIA INC.,

      Defendants.

### NOTICE OF FILING OF NOTICE OF REMOVAL

    **PLEASE TAKE NOTICE** that Defendants by their attorneys, Bowles Rice McDavid Graff & Love LLP, filed a Notice of Removal pursuant to 28 U.S.C. §§ 1331, 1332, 1441, 1442, and 1446, removing the captioned action from the Circuit Court of Putnam County, West Virginia, in which it is now pending, to the United States District Court for the Southern District of West Virginia.

    **PLEASE TAKE FURTHER NOTICE** that a true and correct copy of the Notice of Removal and Certificate of Service accompanies this Notice of Filing of Notice of Removal.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to 28 U.S.C. § 1446(d), the filing of the Notice of Removal and this Notice of Filing of Notice of Removal effects the removal of this action to the United States District Court for the Southern District of West Virginia.

MONSANTO COMPANY, PHARMACIA
CORPORATION, FLEXSYS AMERICA CO.,
FLEXSYS AMERICA, L.P., APOGEE COAL
COMPANY, LLC, and SOLUTIA INC.
By Counsel

Charles M. Love, III (WV Bar No. 2254)
P. Michael Pleska (WV Bar No. 2919)
Bowles Rice McDavid Graff & Love LLP
600 Quarrier Street
P.O. Box 1386
Charleston, West Virginia 25325-1386
*Attorneys for Defendants*

2

## CERTIFICATE OF SERVICE

I, Charles M. Love, III, of Bowles Rice McDavid Graff & Love LLP, counsel for Defendants, do hereby certify that I have served the **Notice of Filing of Notice of Removal** on this 14th day of December 2009, by forwarding a true and exact copy of same, via United States mail, postage prepaid, to the following:

> W. Stuart Calwell, Esq.
> The Calwell Practice
> Law & Arts Center West
> 500 Randolph Street
> Charleston, West Virginia  25302
> *Counsel for Plaintiff*

Charles M. Love, III (WV Bar No. 2254)
P. Michael Pleska (WV Bar No. 2919)
600 Quarrier Street
P.O. Box 1386
Charleston, West Virginia 25325-1386
*Attorneys for Defendant Monsanto Company*