# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

ROBERT C. CARTER

                Plaintiff,

v.                                        CIVIL ACTION NO.  3:08-cv-01359

MONSANTO COMPANY, et al.,

                Defendants.

### ORDER

Pending before the court in this class action suit is the plaintiffs' Motion to Remand for Lack of Subject Matter Jurisdiction [Docket 35] and Motion to Remand for Voluntary Dismissal or in the Alternative for Voluntary Dismissal [Docket 50].  For the reasons herein, the Motion to Remand for Lack of Subject Matter Jurisdiction is **GRANTED** and the Motion to Remand for Voluntary Dismissal is **DENIED**.

## I.      Background

This class action suit raises several claims based on the defendants' alleged disposal of the agricultural herbicide 2, 4, 5-trichlorophenoxyacetic acid ("2, 4, 5-T") and the herbicide's toxic byproducts from its chemical plant in Nitro, West Virginia (the "Nitro Plant").  Defendant Monsanto[1] began producing 2, 4, 5-T at the Nitro Plant in 1948 and continued producing the herbicide until about 1971.  During the Vietnam War, Defendant Monsanto sold 2, 4, 5-T to the

---

[1]  The other defendants in this matter have been sued as owners and operators of the Nitro Plant, or as successors to the liabilities of companies that owned or operated the plant during the relevant time period.

EXHIBIT

**16**

federal government to be used as a primary active component of the military herbicide Agent Orange. (Notice Removal, Ex. 1, Corrected 4th Am. Compl. ¶ 7.) The production of 2, 4, 5-T results in the formation of a toxic byproduct called 2, 3, 7, 8-tetracholorodibenzoparadioxin, or "dioxin," and dibenzo furans ("furans"). (*Id.* ¶ 7.)

The class members in this case allege that the defendants' disposal of dioxins, furans and other hazardous waste materials generated by the production of 2, 4, 5-T into the Manila Creek dump site caused injury to persons living near and downstream from that dump site. (*Id.* ¶¶ 8-21.) The class in this case is defined by geographic parameters and includes "[c]urrent property owners in the 100-year flood plain of Manila Creek . . . Heizer Creek . . . and the Potalico River . . . in Putnam County," which are all locations downstream from the Manila Creek dump site. (Notice Removal, Ex. 2, Class Certification Order 2.)

This class action is just one of fifty-five civil suits filed in the Circuit Court of Putnam County of West Virginia ("Circuit Court"), seeking damages based on exposure to the substances produced at the Nitro Plant and their byproducts. These suits, which I will collectively call the "Parallel Litigations," include fifty-three individual suits ("Individual Litigations"), and two class actions, including the instant matter and *Bibb et al. v. Monsanto Co. et al.*, No. 04-C-465 (Circuit Court, Putnam County, W. Va.). The defendants removed all fifty-five Parallel Litigations to this court on November 21, 2008. (Notice Removal.) The defendants asserted that this court had subject matter jurisdiction over the Parallel Litigations based on the plaintiffs' recent revelation that their cases were based in part on injuries caused by the *production* of 2, 4, 5-T rather than just the *disposal* of that substance and its byproducts. (*Id.* at 2-3.) "[B]ecause Monsanto performed these production activities, or a substantial portion of them, under the aegis of the federal government and

as a federal officer . . ." the defendants explained that they could "assert[] federal defenses sufficient for removal under [the federal officer removal statute, 28 U.S.C.] § 1442." (*Id.* at 3, 6.) Specifically, the defendants asserted as federal defenses the government contractor defense and an immunity defense under the Defense Production Act, 50 App. U.S.C. § 2061 et seq. (*Id.* at 6.) The plaintiffs subsequently filed a motion to remand all of the Parallel Litigations on procedural grounds [Docket 9]. On December 19, 2008, I remanded all of the Parallel Litigations, except for this one, because their removal was untimely.

On March 20, 2009, the plaintiffs in this matter filed a new Motion to Remand [Docket 35] based on this court's lack of subject matter jurisdiction. Unlike the first motion to remand, in which the plaintiffs asserted procedural defects in removal, the instant motion challenges this court's subject matter jurisdiction. Specifically, the plaintiffs argue that they only seek relief from injuries caused by the *disposal* of 2, 4, 5-T waste into the Manila Creek dump site, which was not an activity "under the aegis of the federal government and as a federal officer." Contrary to the defendants' assertion, the plaintiffs argue that they are not seeking relief from any injuries caused by the *production* of 2, 4, 5-T.

Before this court ruled on the Motion to Remand, the plaintiffs filed another motion in which it renewed its Motion to Remand ("Renewed Motion to Remand") [Docket 50]. In that motion, the plaintiffs state additional grounds for remand. Specifically, the plaintiffs assert their intention to seek leave to voluntarily dismiss this action once it is remanded to the Putnam County Circuit Court. Because the Circuit Court is more familiar with the instant matter than this court, the plaintiffs argue that the Circuit Court is better suited to address the complicated issues associated with dismissing a class action. They further assert that remanding this matter for dismissal would "obviate any need

-3-

by this Court to address the other issues relating to this Court's jurisdiction . . . ." (Pls.' Mem. Supp. Renewed Mot. Remand 5 [Docket 50].)  In the alternative, the plaintiffs seek permission from this court to voluntarily dismiss the case.

The defendants filed a response to the plaintiffs' Renewed Motion for Remand [Docket 56]. The defendants argue that the plaintiffs' Renewed Motion is inappropriate because: (1) they are "not entitled to raise additional arguments in support of a fully briefed motion pending before the court," (2) "the relative efficiencies of the state court are not a valid basis for remand," and (3) the motion was time barred because it was a motion for remand on grounds other than the court's lack of subject matter jurisdiction and was filed more than thirty days after removal.  (Defs.' Mem. Opp'n Renewed Motion Remand 2, 6.)  The defendants also argue that this court should not grant the plaintiffs' alternative motion for voluntary dismissal because such a ruling would render the past nine years of litigation a waste and would deprive the defendants of the right to have the question of government contractor immunity determined by a federal court.[2]  The plaintiffs subsequently filed a Reply [Docket 58].[3]

## II.  Discussion

### A.  Motion to Remand Based on Plaintiffs' Intention to Voluntarily Dismiss

Because the plaintiffs' Renewed Motion to Remand suggests that I need not resolve the issues raised in its original Motion to Remand, I will address the plaintiffs' arguments in the

---

[2] On April 27, 2009, the defendants filed a Motion for Partial Summary Judgment Based on the Government Contractor Defense [Docket 47].

[3] The plaintiffs also filed a Notice of New Authority in Support of Plaintiffs' Renewed Motion to Remand [Docket 57].  The defendants filed a Response in Opposition to the Notice [Docket 59].

Renewed Motion and the defendants' response first. As an initial matter, it would be inappropriate for me to allow the voluntary dismissal of this matter prior to confirming this court's jurisdiction. The plaintiffs' Motion to Remand has called this court's subject matter jurisdiction into question and I have not yet ruled on that question. When a court has doubts about its subject matter jurisdiction, it should resolve those doubts before ruling on a motion for voluntary dismissal pursuant to Federal Rule of Civil Procedure 41(a)(2). *Taylor v. Com. of Va., Dep't of Transp.*, 170 F.R.D. 10, 12 (E.D. Va. 1996). Accordingly, I decline the plaintiffs' invitation to dismiss this matter prior to ruling on the pending Motion to Remand.

Further, I reject the plaintiffs' suggestion that the Circuit Court's superior efficiency and familiarity with this matter justifies remand. Though such considerations may be appropriate for a federal court deciding whether to exercise supplemental jurisdiction over state law claims, they are inappropriate in this case because the case was removed based on federal officer removal. The underlying purpose of the federal officer removal statute, 28 U.S.C. § 1442(a), is to "protect[] . . . the exercise of legitimate federal authority by government agents against interference by individual states through their courts . . . ." Wright, Miller & Cooper, Federal Practice & Procedure: Jurisdiction 3d § 3727 at 136 (1998). Such vital interests of the federal government take precedence over concerns for judicial economy and efficiency. Because I **FIND** it inappropriate to remand this matter for voluntary dismissal in state court and also to permit voluntary dismissal in this court, the plaintiffs' Renewed Motion to Remand [Docket 50] is **DENIED**.

Having denied that motion, I will proceed with my inquiry into this court's subject matter jurisdiction over this class action. "If at any time before the final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c).

-5-

Therefore, I must determine whether the defendants can establish grounds for federal officer removal and whether this court has subject matter jurisdiction over this action.

### B. Motion to Remand Due to this Court's Lack of Subject Matter Jurisdiction

The plaintiffs argue that this matter should be remanded because unlike the other Parallel Litigations, which had raised claims based on the emission of toxins from the Nitro plant that occurred during 2, 4, 5-T production, this action only concerns damages based on the defendants' disposal of 2, 4, 5-T waste at the Manila Creek dump site. (Pls.' Mem. Supp. Mot. Remand Subject Matter Juris. 4 [Docket 36].) Because that disposal was not controlled by the federal government, the plaintiffs argue, this court does not have jurisdiction over the matter. Before addressing the substance of the plaintiffs' motion, however, I must first discuss two preliminary issues raised by the parties. First, I must determine whether my consideration of this court's subject matter jurisdiction is barred by the law of the case doctrine as asserted by the defendants. (Defs.' Resp. Opp'n Mot. Remand Subject Matter Juris. 5 [Docket 41].) Second, I must determine the scope of materials that I may review when assessing this court's subject matter jurisdiction.

### 1. Law of the Case Doctrine Does Not Bar Review

"[T]he doctrine [of the law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case." *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988) (alteration in original)). This doctrine is based on the "sound policy that when an issue is once litigated and decided, that should be the end of the matter." *United States. v. U.S. Smelting Refining & Min. Co.*, 339 U.S. 186, 198 (1950). Accordingly, the doctrine "promotes the finality and efficiency of the judicial process by 'protecting

-6-

against the agitation of settled issues.'" *Christianson*, 486 U.S. at 816 (quoting 1B J. Moore, J. Lucas, & T. Currier, Moore's Federal Practice ¶ 0.404[1], p. 118 (1984)). "Although the doctrine applies both to questions actually decided as well as to those decided by 'necessary implication,' it does not reach 'questions which might have been decided but were not.'" *Seijman v. Warner-Lambert Co., Inc.*, 845 F.2d 66, 69 (4th Cir. 1988) (quoting *Carpa, Inc. v. Ward Foods, Inc.*, 567 F.2d 1316, 1320 (5th Cir. 1978)). Where the question at issue has not already been decided in the case, explicitly or by necessary implication, the law of the case doctrine does not apply. *See United States v. Knox*, 363 F. Supp. 2d 845, 848 (W.D. Va. 2005).

Moreover, the law of the case doctrine is a discretionary rule and is only applied to the extent that it promotes the policies it was designed to protect. *See U.S. Smelting Refining & Mining*, at 199; *Sejman*, 845 F.2d at 68-69; *Baron Fin. Corp. v. Natanzon*, 509 F. Supp. 2d 501, 520 (D. Md. 2007). "[T]he law-of-the-case doctrine 'merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power.'" *Christianson*, 486 U.S. at 817 (quoting *Messinger v. Anderson*, 225 U.S. 436, 444 (1912)). Thus, "[a] court has the power to revisit prior decisions of its own . . . .'" *Id.* (quoting *Arizona v. California*, 460 U.S. 605, 618 n.8 (1983)).

The law of the case doctrine does not bar my consideration of this court's subject matter jurisdiction because I have never decided that issue. I previously have determined only that the defendants' removal of this action to federal court pursuant to § 1442 was timely. To demonstrate the narrow scope of my earlier decision, I will provide a more detailed procedural history of this case with a specific focus on the plaintiffs' first motion to remand. On November 21, 2008, the defendants removed this matter pursuant to the federal officer removal statute, 28 U.S.C. § 1442.

As a basis for removal, the defendants asserted that they originally had believed that the plaintiffs' claims in those cases were based on "disposal-related releases of dioxin." (Notice Removal 2.) But on October 31, 2008, the defendants learned that the plaintiffs were "intending to develop evidence purporting to show injury from Monsanto's production practices." (*Id.*) Because the defendants produced 2, 4, 5-T "under the aegis of the federal government as a federal officer," the "revelation" that the plaintiffs sought damages based on *production* activities rendered the cases ripe for removal under 28 U.S.C. § 1442(a)(1). (*Id.* at 2, 4.)

The plaintiffs filed their first Motion to Remand this action on November 24, 2008 [Docket 9]. In support of their motion, the plaintiffs incorporated the memorandum of law attached to the Motion for Remand in *Bibb*.[4] (Mot. Remand.) In that memorandum, the plaintiffs argued that the removal of the Parallel Litigations was untimely and thus procedurally defective. (Mot. Remand, Ex. 2, *Bibb* Mem. Supp. Mot. Remand 2 ("*Bibb* Mem. Supp. Mot. Remand").) Referencing only the *Bibb* Complaint, the plaintiffs argued that the defendants had already known the plaintiffs were alleging injuries caused by production activities at the Nitro Plant. (*Id.* at 7.) They further explicitly stated that they were "only addressing the procedural defects in Defendants' removal, and reserve[d] the right to challenge the Court's subject matter jurisdiction at a later date, if necessary." (*Id.* at 2 n.1.)

I entered an Order on December 19, 2008 ("December 2008 Order") [Docket 21] in which I remanded all of the Parallel Litigations except for the instant matter. I found that the complaints

---

[4] Indeed, class counsel in the instant matter, who represent the plaintiffs in all of the Parallel Litigations, filed in *Bibb* the only substantive motion and memorandum of law among the Parallel Litigations. As in the instant matter, the *Bibb* motion to remand and memorandum in support were incorporated into the motions to remand for all of the Parallel Litigations.

in *Bibb* and the Individual Litigations were very similar and that those complaints provided notice of the plaintiffs' production-based claims. (December 2008 Order 27-30.) Accordingly, the removal of those actions, more than thirty days after the filing of the complaints, was untimely. I also found that the complaint in this case alleged injuries caused by the defendants' disposal of waste into the Manila Creek dump site rather than the production of 2, 4, 5-T. (*Id.* at 25.) I further found that the removal of the *Carter* action was timely because the earliest the defendants could have been on notice that "any claims in the *Bibb* litigation would also be relevant to the *Carter* litigation" was November 3, 2008. (*Id.* at 32.)

Significantly, the December 2008 Order did not address this court's subject matter jurisdiction. Further, it did not address whether the federal government's involvement with the activities at the Nitro Plant were sufficient to confer federal officer jurisdiction on this court. I explicitly stated that the December 2008 Order was concerned solely with the question of "when the defendants first had notice of production based claims." (*Id.* at 23 n.8.) I merely found that the plaintiffs' Rule 16 Pretrial Submission filed on November 3, 2008, "may have [put the defendants] on notice that any claims in the *Bibb* litigation would also be relevant to the *Carter* litigation." (December 2008 Order 32.) I therefore found that the removal of *Carter* was timely. I did not address the propriety of removal in any other respect. Accordingly, I have never determined that the instant matter "implicates [the defendants'] *production* of 2, 4, 5-T, and not merely the disposal of waste from those processes." (Defs.' Mem. Opp'n Mot. Remand Subject Matter Juris. 5.)

Because I have never determined whether the plaintiffs in this action allege injuries based on the *production* of 2, 4, 5-T at the Nitro Plant, the law of the case doctrine does not preclude my examination of that question and this court's § 1442 jurisdiction at this time. Even if I had made

such a determination, I would still have the discretion under the law of the case doctrine to re-examine these issues because my obligation to "reach the correct judgment under law" is at its apex "in the context of subject matter jurisdiction issues, which call into question the very legitimacy of a court's adjudicatory authority." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003) (explaining that the law of the case doctrine does not limit the court's power to reconsider earlier rulings in the context of subject matter jurisdiction issues). Having decided that I am not barred from examining this court's subject matter jurisdiction, I will now review the plaintiffs' preliminary argument regarding the documents that I may consider in the course of that examination.

## 2. Scope of Reviewable Materials

The plaintiffs dispute the scope of the record that I may consider in resolving the instant Motion to Remand. Asserting that propriety of removal for federal officer removal is based solely on the jurisdictional facts alleged in the Notice of Removal, the plaintiffs argue that I should disregard the exhibits attached to the defendants' response that demonstrate the government's involvement in the 2, 4, 5-T production at the Nitro Plant. (Pls.' Reply 3 n.1 (citing *Pantalone v. Aurora Pump Co.*, 576 F. Supp. 2d 325, 239 (D. Conn. 2008)) [Docket 44].)

The plaintiffs are correct that a notice of removal should itself provide the jurisdictional facts supporting removal under § 1442(a). A defendant seeking removal under § 1442(a) must provide "candid, specific and positive" facts in his notice of removal showing that a plaintiff's claims are based on its conduct as a federal officer. *See Willingham v. Morgan*, 395 U.S. 402, 408 (1969); *Jamison v. Wiley*, 14 F.3d 222, 238 (4th Cir. 1994) (explaining that the defendant's specific allegations that the plaintiff's charges were based on his conduct as a federal officer and under color of his office were sufficient to establish a federal defense conferring removal jurisdiction under §

1442(a)). Courts may, however, consider documents submitted after the notice of removal, including those attached to subsequent motions, when appropriate. *See Willingham*, 395 U.S. at 407 n.3. In *Willingham*, the plaintiff sought remand of a case that had been removed pursuant to the federal officer removal statute because the defendants had not been acting in their official capacity. *Id.* at 407. The only facts refuting the plaintiff's allegation were found in affidavits attached to the defendants' post-removal motion for summary judgment. *Id.* The Supreme Court held that although the affidavits should have been attached to the notice of removal, it was proper to "treat the removal petition as if it had been amended to include the relevant information contained in the later filed affidavits." *Id.* at 408 n.3.

Courts have observed that the propriety of treating later-filed documents as amendments to a notice of removal depends on the content of the notice of removal and the record as a whole. *See USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 206 n.12 (3d Cir. 2003); *see also Buell v. Sears, Roebuck & Co.*, 321 F.2d 468, 471 (10th Cir .1963) ("If there were some suggestion in the record supporting . . . jurisdiction, we might deem the petition for removal amended to comport with the proof."). Where subsequently-filed documents clarify allegations already stated in the notice of removal, a court may construe those documents as amending the notice of removal. *See USX Corp.*, at 206 n.12.

The defendants' Notice of Removal alleged with specificity that "[f]ederal officers . . . acting in the course of their official duties and under color of their office, compelled [the defendants] . . . to supply Agent Orange . . . for use by the United States military in Vietnam." (Notice Removal 6.) The defendants further explained that the federal officers' conduct allowed them to assert a government contractor defense sufficient for removal under § 1442. These allegations in the Notice

of Removal were sufficient to demonstrate a "colorable" federal defense to the suit and to support the requested removal. *See Jamison*, 14 F.3d at 238. The affidavits attached to the defendants' Memorandum in Opposition to Motion to Remand do not provide new grounds for this case's removability, but rather clarify the conduct of the federal officers and the relationship between the defendants and the federal government. Accordingly, it is appropriate for this court to consider the affidavits and attached exhibits as amending the defendants' Notice of Removal and to review them in determining this court's subject matter jurisdiction.

Having determined that my evaluation of this court's subject matter jurisdiction does not violate the law of the case, and that I may consider the affidavits attached to the defendant's response, I will proceed to determine whether the defendants have established this court's removal jurisdiction pursuant to § 1442(a).

### 3.     Federal Officer Removal Jurisdiction

Under 28 U.S.C. § 1442(a), a state court civil action commenced against a federal officer for "any act under color of such office," may be removed to federal court. 28 U.S.C. § 1442(a)(1). The purpose of this statute is to ensure "the protection of the exercise of legitimate federal authority by government agents against interference by individual states through their courts . . . ." Wright, Miller & Cooper, Federal Practice & Procedure: Jurisdiction 3d § 3727 at 136 (1998); *see also Taylor v. Comsat Corp.*, No. 2:06-cv-0920, 2006 WL 3246508, at *2 (S.D. W. Va. Nov. 8, 2006.) (Copenhaver, J.) ("The statute is rooted in federal supremacy and a mistrust of the ability of state courts to protect federal interests."). In order to remove an action pursuant to § 1442(a), a defendant must establish that (1) it is a "person" within the meaning of the statute, (2) it acted under the direction of a federal officer, (3) it has a colorable federal defense to the plaintiffs' claims, and (4)

there is a causal nexus or connection "between the plaintiffs' claims and acts it performed under color of federal office." *Virden v. Altria Group, Inc.*, 304 F. Supp. 2d 832, 843 (N.D. W. Va. 2004); *see Taylor*, 2006 WL 3246508, at *2.

The parties' debate with respect to the instant motion has focused primarily on the second and fourth elements. Under the second element, a defendant acts under the control of a federal officer if the federal officer has "direct and detailed control" over the activity. *Pack v. AC and S, Inc.*, 838 F. Supp. 1099, 1103 (D. Md. 1993) (citing *Fung v. Abex Corp.*, 816 F. Supp. 569, 572 (N.D. Cal. 1992)); *see also Ryan v. Dow Chem. Co.*, 781 F. Supp. 934, 947 (E.D.N.Y. 1992) (citing *North Carolina v. Ivory*, 906 F.2d 999 (4th Cir. 1990)). A defendant can establish the federal officer's "direct control" by showing "strong government intervention and the threat that [it] will be sued in state court 'based upon actions taken pursuant to federal direction.'" *Fung*, 816 F. Supp. at 572 (quoting *Gulati v. Zuckerman*, 723 F. Supp. 353, 359 (E.D. Pa. 1989)). It is not enough that the defendant's actions occurred under the "general auspices of a federal office or officer" or that the defendant participated in a regulated industry. *Ryan*, 781 F. Supp. at 947. A private actor acts under a federal officer when it "*assist[s]*, or help[s] *carry out*, the duties or tasks of the federal superior." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008) (quoting *Watson v. Phillip Morris Cos., Inc.*, 551 U.S. 142, 127 S. Ct. 2031, 2307 (2007)) (emphasis in original).

Even if the defendant can satisfy the second element by showing that it acted under the direction of a federal officer, federal officer removal is only appropriate if the defendant can also establish the fourth element by demonstrating a causal nexus between the acts taken under federal control and the alleged acts underlying the plaintiffs' claims. The causal nexus requirement does not establish a stringent standard: "[t]he statute does not require that the prosecution must be for the

-13-

very acts which the officer admits to have been done by him under federal authority." *Isaacson*, 517 F.3d at 137 (quoting *Maryland v. Soper*, 270 U.S. 9, 33 (1926)) (alteration in original). The defendants in this case need only show that the federal direction created the circumstances underlying the liability. *See Jefferson County, Ala. v. Acker*, 527 U.S. 423, 433 (1999). Thus, the defendants may satisfy the causal nexus requirement by showing that "the acts for which they are being sued . . . occurred because of what they were asked to do by the Government," or that "the act that is the subject of [p]laintiffs' attack . . . occurred *while* [d]efendants were performing their official duties." *Isaacson*, 517 F.3d at 137-38.

In several parts of their memorandum, the plaintiffs conflate the second and fourth elements.[5] They argue that the defendants cannot establish the elements justifying federal officer removal because the defendants cannot show that their Nitro Plant disposal practices were conducted under federal control. But the defendants need not show that the disposal practices, which form the basis of the plaintiffs' claims, were the same actions that were conducted under federal control. They need only show (1) that they conducted some activity under the direct and detailed control of a federal officer, and (2) that because of that activity or in the course of performing that activity, they negligently disposed dioxins as alleged in the Complaint. Accordingly, I will analyze the parties' arguments according to that framework. But before I address the elements of federal officer removal, I will first delineate the nature and scope of the alleged acts underlying the plaintiffs' claims.

---

[5] Indeed, many courts do the same. *See, e.g., N.J. Dep't of Envtl. Prot. v. Exxon Mobil Corp.*, 381 F. Supp. 2d 398, 403 n.7 (D.N.J. 2005).

-14-

### a. Scope and Nature of the Plaintiffs' Claims

In order to determine whether the defendants have established the elements for federal officer removal, I must first determine the nature and the scope of the plaintiffs' claims. The parties dispute the nature of those claims, specifically, whether the plaintiffs' claims are based in part on the defendants' *production* of 2, 4, 5-T rather than just *disposal* of 2, 4, 5-T waste. The plaintiffs assert that this matter "has always unequivocally been about [the defendants'] dumping of 2, 4, 5-T waste at a remote location in Putnam County, and the subsequent waterborne migration of dioxins from the remaining waste at the dump . . . ." (Pls.' Mem. Supp. Mot. Remand Subject Matter Juris. 6.)

The defendants accuse the plaintiffs of recharacterizing their claims in the instant motion to be based only on disposal, rather than production *and* disposal activities as alleged in their Complaint. (Defs.' Resp. Opp'n Mot. Remand Subject Matter Juris. 5.) To support their contention that the plaintiffs in the instant matter are seeking damages also for production-based injuries, the defendants have cited to the plaintiffs' Circuit Court Rule 16 Pretrial Submission in *Bibb*. In that document, plaintiffs' counsel stated that "[t]he relief sought for members of the *Carter* class, with the exception of perhaps the riparian rights claim, is the same relief sought in the *Bibb* class." (Notice Removal, Ex. 3, Plaintiffs' Rule 16 Pretrial Submission in *Bibb* at 1.) The plaintiffs explain that this statement only shows that the plaintiffs in both actions were seeking the same remedies: property remediation and compensation for diminished property value. (Pls.' Mem. Supp. Mot. Remand Subject Matter Juris. 8.) The fact that the plaintiffs were seeking the same remedies does not change the fact, the plaintiffs argue, that they are only seeking relief from injuries caused by the defendants' disposal practices. (*Id.* at 9.)

-15-

The defendants also argue that a court's subject matter jurisdiction is determined by the record before the court at the time the case was removed. (*Id.* at 8.) Because the plaintiffs' claims at the time of removal included claims based on production as well as disposal, the defendant asserts that remand is inappropriate and the plaintiffs should not be allowed to narrow their case at this point in an attempt to avoid federal jurisdiction. Finally, the defendants argue that, contrary to the plaintiffs' assertions, the "*Carter* and *Bibb* cases are inexorably intertwined." (*Id.* at 9.) Because the class members in this action are also members of the *Bibb* action, and because they are seeking remedies for dioxin contamination on their property in both actions, the defendants argue that the actions are not distinct. (*Id.*) The defendants argue that "[i]n light of the important public policy interests underlying the federal officer removal statute, such specious distinctions [such as the source of the dioxin contamination] cannot form the basis upon which federal jurisdiction rests." (*Id.*)

As discussed above, the plaintiffs did not address in their first Motion to Remand whether the instant matter involved claims based on the defendants' production of 2, 4, 5-T. I only held that the defendants could not have had notice of such claims prior to the submission of the Rule 16 Pretrial Submission on November 3, 2008. I did find however that "[t]he injuries alleged in the *Carter* Complaint clearly stem from [the defendants'] *disposal* of dioxin contaminated waste at the Manila Creek site and the subsequent leaching of dioxin into neighboring waterways and property. The *Carter* plaintiffs did not allege any injuries based on the 2, 4, 5-T production process itself." (December 2008 Order 25.)

-16-

The Complaint[6] has without alteration stated claims based only on the defendants' disposal of 2, 4, 5-T byproducts at the Manila Creek dump site. (*See* December 2008 Order 24-25.) Moreover, the defendants have provided no evidence that this matter involves claims for production-based injuries. The Rule 16 Pretrial Submission upon which the defendants rely only states that the parties were seeking the same *remedies*, not that they were asserting the same *claims*. Accordingly, I **FIND** that the plaintiffs have asserted claims based only on the defendants' *disposal* of 2, 4, 5-T dioxin contaminated waste at the Manila Creek dump site.

I recognize the implication of this finding—that if the Rule 16 Pretrial Submission did not in fact alter the plaintiffs' claims in this matter and render the action removable, then the defendants' removal of this matter was untimely. The plaintiffs waived the right to challenge the timeliness of the removal on those grounds, however, by incorporating *Bibb's* Motion to Remand and Memorandum of Law into their Motion to Remand for this action. They thus effectively conceded for the purposes of their first motion that the Complaint contained claims based on production-based activities. They never argued that the Complaint did not contain production-based activities, nor that the defendants were incorrect in their assumption that the Rule 16 Pretrial Submission demonstrated the inclusion of such claims in the Complaint. But the plaintiffs' concession for the purposes of their procedural challenge to the timeliness of removal does not change the scope of the claims asserted in the Complaint. This court's subject matter jurisdiction depends on the actual scope of the plaintiffs' claims in this action. Because this action only involves claims for injuries

---

[6] The plaintiffs amended their Complaint several times over the course of this litigation. The last-filed Complaint was the Corrected Fourth Amended Complaint. (Notice Removal, Ex. 1, Corrected 4th Am. Compl.) For the purposes of the instant order, I will refer to the Corrected Fourth Amended Complaint as the "Complaint."

caused by disposal at the Manila Creek dump site, and because the plaintiffs have waived their right to remand based on the untimely removal of those claims, the only remaining question is whether this court has subject matter jurisdiction over those claims by virtue of this court's federal officer removal jurisdiction under 28 U.S.C. § 1442(a).

### b. The Production of 2, 4, 5-T at the Nitro Plant was an Act "Under the Direction of a Federal Officer"

The plaintiffs argue that the defendants did not act under the direction of a federal officer for two reasons. First, they argue that the alleged disposal of dioxin-contaminated waste occurred in the 1950s, before the defendants commenced Agent Orange production on behalf of the United States government. (Pls.'Mem. Supp. Mot. Summ. J. Subject Matter Juris. 12 n.2.) Second, they argue that the defendants' contract with the government was for the production of Agent Orange, and not the component substances manufactured at the Nitro Plant. (*Id.* at 14; Pls.' Reply 10-11.) Specifically, the plaintiffs assert that the 2, 4, 5-T produced at the Nitro Plant was an "off-the-shelf commercial herbicide" that "was not specially formulated and manufactured to U.S. government specifications," and not manufactured under federal control. (Pls.'Mem. Supp. Mot. Summ. J. Subject Matter Juris. 14-15.)

The defendants observe that the plaintiffs' assertions as to the relevant time period is misleading because the Fourth Amended Complaint clearly states claims that extend into the government contract period. (Defs.' Resp. Opp'n Mot. Remand Subject Matter Juris. 7.) The defendants further submit that the defendants produced 2, 4, 5-T pursuant to "detailed and precise specifications" provided by the federal government. (*Id.* 11 (citing to Certification of Charles M. Love, III, dated April 3, 2009 ("Love Cert."), Ex. C.).)

-18-

### i. The Defendants' Alleged Conduct Occurred After the Defendant Entered Into a Contract with the Government

The plaintiffs cannot assert that their claims are based on contamination that occurred prior to the defendants' production of 2, 4, 5-T for use by the United States government. The plaintiffs have not presented in this case a specific date on which the Nitro Plant began producing 2, 4, 5-T pursuant to a federal government contract or for federal government use. Relying on other cases examining federal government contracts for the production of Agent Orange, the plaintiffs suggest that such production could not have occurred at the Nitro Plant prior to 1961, the year that the defendants began producing and delivering Agent Orange to the federal government. (Pls.' Mem. Supp. Mot. Remand Subject Matter Jurisdiction 12 n.2 (citing *In re "Agent Orange," Product Liability Litigation*, 304 F. Supp. 2d 442, 449 (E.D.N.Y. 2004).) But the instant matter is based on injuries caused by the defendants' disposal activities, not their production activities, and neither the Fourth Amended Complaint nor any other evidence on the record indicates that the defendants stopped disposing 2, 4, 5-T waste material at the Manila Creek dump site before 1961. The Fourth Amended Complaint only states that the defendants *began* disposing of 2, 4, 5-T waste material no later than 1958; it does not state when such disposal ended. (Notice Removal, Ex. 1, Corrrected 4th Am. Compl. ¶ 10.) Moreover, the plaintiffs' factual allegations continue through the Vietnam War and the 1980s. Because the plaintiffs' claims are not clearly limited to a time period prior to the time during which the defendants were manufacturing 2, 4, 5-T for use by the federal government, I reject the plaintiffs' argument.

ii.     **Some Aspects of the Defendants' Production and Distribution of 2, 4, 5-T Occurred Under the Control of a Federal Officer**

The plaintiffs argue that the defendants did not act under the control of a federal officer because although the defendants produced Agent Orange pursuant to a federal contract, it did not produce 2, 4, 5-T, the Agent Orange ingredient produced at the Nitro Plant, pursuant to government specifications. Accordingly, the plaintiffs argue that the defendants' production of 2, 4, 5-T at the Nitro Plant was not produced under the "aegis of a federal officer." (Pls.' Mem. Supp. Mot. Remand Subject Matter Juris. 14.) The defendants disagree and assert that the federal government did provide specifications for the production of 2, 4, 5-T. (Defs.' Resp. Opp'n Mot. Remand Subject Matter Juris. 11.)

Documents provided by the defendants show that the federal government and its officers were actively involved in the defendants' 2, 4, 5-T production at the Nitro Plant. In order to satisfy their government contracts for Agent Orange, the defendants were required to redirect many of their resources, including their supplies of 2, 4, 5-T, towards the production of Agent Orange. (Love Cert., Exs. B, F.) The defendants' government contracts legally required them to prioritize the government's demand for 2, 4, 5-T used for Agent Orange production over the demands of their civilian customers. (*Id.*) Much of the 2, 4, 5-T specifically produced at the Nitro Plant was diverted during the 1960s for the production of Agent Orange. (*Id.*, Ex. M.) In some months, all of the 2, 4, 5-T manufactured at the Nitro Plant was used for Agent Orange production. (*Id.*)

The defendants' distribution of 2, 4, 5-T from the Nitro Plant demonstrates that the federal government's demand for Agent Orange and its control over the defendants' 2, 4, 5-T production were inextricably intertwined. An illustration of this relationship can be found in a letter from the

United States Department of Commerce to the Monsanto Company, dated March 24, 1967.  (*Id.*, Ex. A.)  In that letter, Monsanto is directed to increase the rate at which it was delivering Agent Orange and also to provide a monthly report of its 2, 4, 5-T inventory.  (*Id.*)  The letter further provides that Monsanto may obtain tetrachlorobenzene ("TCB"), a necessary ingredient for 2, 4, 5-T, by placing a DO-rated order[7] on its supplier.  (*Id.*)  Government documents show that Monsanto replied that it could comply with the directive as long as it could obtain 600,000 pounds of TCB per month in order to "allow Monsanto to operate its 2, 4, 5-T facility at maximum production rate."  (*Id.*) Monsanto further stated that it would not be able to deliver the requested amount of Agent Orange unless "TCB is received at Nitro, W. Va."  (*Id.*)  This correspondence shows that the 2, 4, 5-T produced at the Nitro Plant was at times conscripted entirely for the production of government-demanded Agent Orange.  It further demonstrates that the federal government directed the amount of 2, 4, 5-T produced at the Nitro Plant and at times utilized its authority to facilitate the necessary 2, 4, 5-T production at the Agent Orange plant.

The defendants have provided other evidence suggesting federal control over 2, 4, 5-T production at the Nitro Plant.  First, there is some indication that the Department of Defense may have contracted directly for 2, 4, 5-T rather than for Agent Orange.  (*Id.* at F.)  Also, the defendants have offered evidence that the federal government provided the defendants with specifications for the composition of the 2, 4, 5-T being produced at the Nitro Plant.  (*Id.*, Exs. C, G, H.)

_____

[7]  At the time that the federal government ordered Agent Orange from the defendants, the federal government utilized a rating system for its procurement orders.  *Ryan*, 781 F. Supp. at 938. A DO-rating designated a category of government procurement orders.  *Id.* According to the government's regulations, all rated orders, including DO- rated orders, were required to "be accepted and filled regardless of existing contracts and orders."  *Id.* (quoting Business and Defense Services Administration Regulation 2 § 10.)

In summary, the record shows that some aspects of the defendants' production of 2, 4, 5-T at the Nitro Plant occurred under more than merely the "general auspices" of a federal officer. Indeed, the record demonstrates "strong government intervention." *Pack*, 838 F. Supp. at 1103. The federal officers issued direct and detailed orders controlling the amount of 2, 4, 5-T produced at the Nitro Plant and to whom the defendants could deliver the substance. Further, since the 2, 4, 5-T was being used for federal government purposes, it was being produced pursuant to government specifications. Even though the defendants were producing 2, 4, 5-T prior to entering into government contracts for the production of Agent Orange, and even though they were also supplying 2, 4, 5-T to civilian clients, the defendants' Nitro Plant 2, 4, 5-T production throughout the 1960s in part carried out the tasks of the federal government. *See Isaacson*, 517 F.3d at 137 (finding that defendants were acting under government control when it produced Agent Orange because they were "provid[ing] a product that the Government was using during war—a product that, in the absence of the Defendants, the Government would have had to produce itself").

Accordingly, the plaintiffs' argument against removal based on the fact that the defendants' government contracts were for Agent Orange rather than for 2, 4, 5-T is unavailing. Although the distinction between 2, 4, 5-T and Agent Orange as the object of the government contract is relevant for establishing a causal nexus in products liabilities cases involving the government specified formulation for Agent Orange, *see Isaacson*, 517 F.3d at 137-38; *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 399-400 (5th Cir. 1998), the specific terms of the defendants' contract are not dispositive as to whether the defendant conducted actions under the control of the federal government. In this case, even though the defendants' contracts with the federal government may have only been for Agent Orange rather than for 2, 4, 5-T, the record shows that those contracts gave

-22-

rise to the federal government's direct and detailed control over the amount of 2, 4, 5-T produced

and the purposes for which the substance was used. Therefore, I **FIND** that the defendants were

acting under federal direction when it produced 2, 4, 5-T at the Nitro Plant for some period during

the 1960s.

<div align="center">

c.    **The Defendants Cannot Establish A Causal Nexus Between Its Actions Under Federal Control and the Actions Underlying the Claims**

</div>

The plaintiffs also argue, however, that even if the defendants can show that they produced

substances at the Nitro Plant under the control of a federal officer, federal officer removal is still

improper because no federal contract specified the method of disposing the toxic byproducts of 2,

4, 5-T. (*Id.* at 13.) In other words, the plaintiffs argue that there is no causal nexus between the

defendants' acts under federal control and the acts underlying the Complaint.[8] The plaintiffs argue

that the instant action "has always unequivocally been about Old Monsanto's dumping of 2, 4, 5-T

waste . . . ."[9] (Mem. Supp. Mot. Remand Subject Matter Juris. 6.) As I discussed above, I agree

---

[8] The plaintiffs assert this argument as a sort of worst-case scenario. They argue that "even assuming that [the defendants] did manufacture Agent Orange at its old Nitro plant (which it did not) and assuming that [the plaintiffs] did allege exposure to emissions from the Old Nitro plant during the 2, 4, 5-T manufacturing process (which he did not)," the defendants still cannot show that the federal government controlled emissions from the Nitro Plant. (Pls. Mem. Supp. Mot. Remand Subject Matter Juris. 12-13; *see also id.* at 16-17.) I will not address this exact argument for two reasons. First, as I discussed earlier, the plaintiffs' Complaint alleges injuries solely from the defendants' disposal of toxic dioxins at the Manila Creek dump site and not from any emissions from the Nitro Plant. Second, the plaintiffs' argument again conflates the "acting under" element and the "causal nexus" element for establishing grounds for federal officer removal. The defendants need not show that the federal government directly controlled its disposal practices, whether emissions or dumping. They only need to show a causal nexus between those acts of disposal and the acts that occurred under federal control. *See Isaacson*, 517 F.3d at 137-38. I will pursue the question of whether the defendants have made such a showing.

[9] Both the plaintiffs and the defendants disagree about whether the dioxin contamination of
<div align="right">(continued...)</div>

<div align="center">-23-</div>

with this characterization of the plaintiffs' claims.  Therefore, I must determine whether there is a

causal nexus between the acts undertaken by the defendants under the direction and control of the

federal government and the defendants' practice of disposing waste at the Manila Creek site.

---

[9](...continued)
the Manila Creek dump site and watershed could have been caused by the defendants' actions other
than the disposal at the Manila Creek dump site itself.  The plaintiffs argue that "[t]here is no
pleading or other paper filed in *Carter* that remotely suggests that the dioxin contamination at issue
in *Carter* is the result of anything other than the dumping of toxic waste at the Manila Creek dump
site and the subsequent waterborne contamination such dumping created."  (Pls. Mem. Supp. Mot.
Remand Subject Matter Juris. 7.)  According to the defendants, however, the overlap between the
*Carter* and *Bibb* plaintiff classes indicates that "*all* of the properties [of the class members] which
have allegedly suffered contamination through waterborne dioxin also have allegedly been
contaminated by airborne dioxin suggest[ing] that the underlying issues of the *Carter* and *Bibb* cases
are inexorably intertwined."  (Defs.' Resp. Opp'n Mot. Remand Subject Matter Juris. 9.)  The
defendants also question the plaintiffs' ability to allege injuries based solely on dioxin contamination
in the water: "Perhaps Plaintiff's Counsel believes it will be able to prove which of Monsanto's
purported dioxin (if any) contaminating the land adjacent to Plaintiff's waterways fell from the air,
and which washed up onto land from the water.  Again, this is not likely."  (*Id.*)

The question of whether the contamination of the Manila Creek watershed was caused by
direct disposal at the Manila Creek dump site or by airborne emissions is not relevant to the instant
motion.  The only question before the court is whether the actions underlying the plaintiffs'
Complaint occurred under the control of a federal officer such that the defendants can make out a
colorable federal defense and remove the action to federal court.  The actions underlying the
plaintiffs' Complaint, as discussed above, are the disposal of dioxin and other 2, 4, 5-T waste into
the Manila Creek dump site.  The plaintiffs will have the burden at trial to show that the disposal at
the dump site caused their injuries.  If the defendants show that the contamination and injuries were
caused by another action—for example, the airborne emission of dioxins from the Nitro Plant which
may have occurred under federal control—then the plaintiffs cannot succeed in this action.
Accordingly, the fact that the injuries alleged in this action may have in fact been caused by some
separate conduct by the defendants that might have occurred under federal control is irrelevant to
the jurisdictional question.

Moreover, because I have found that the plaintiffs do not allege injuries for airborne
emissions from the Nitro Plant, I need not consider either parties' arguments concerning the
government's control over such emissions.  (*See* Mem. Supp. Mot. Summ. J. Subject Matter
Jurisdiction 12, 16.)

      **i.**     **There is No Causal Nexus Between the Production and Distribution of 2, 4, 5-T Under Federal Control and the Disposal of 2, 4, 5-T Byproducts at the Manila Creek Dump Site**

Though I have found that the federal government controlled certain aspects of the 2, 4, 5-T production at the Nitro Plant, my review of the documents provided by the defendants reveals that the scope of that control was very narrow. I **FIND** that there was no causal nexus between the defendants' production and distribution of 2, 4, 5-T at the Nitro Plant under federal control and the defendants' disposal of 2, 4, 5-T waste at the Manila Creek dump site. The defendants have shown that the federal government controlled the chemical composition of 2, 4, 5-T, the amount of 2, 4, 5-T that was produced at the Nitro Plant, and the manner in which 2, 4, 5-T was distributed. They have not provided any evidence that those production parameters led them to dispose of the 2, 4, 5-T waste at the Manila Creek site. It is true that the defendants were required to dispose of the waste from the 2, 4, 5-T that was provided to the government in *some* fashion. But the circumstances leading to the disposal at the Manila Creek dump site existed prior to the federal government's involvement. The defendants produced 2, 4, 5-T prior to entering government contracts for Agent Orange and continued to sell the substance to civilians even while diverting 2, 4, 5-T for government use. Therefore, even absent the federal government's demand for 2, 4, 5-T, the defendants were producing 2, 4, 5-T and disposing of its waste in some manner. They were not required to dump 2, 4, 5-T waste into the Manila Creek dump site because of the government's demand for Agent Orange. *See Campbell*, 2008 WL 4415078, at *4 (finding no causal nexus between the defendants' actions and the actions undertaken pursuant to federal control because "[t]here were no orders or direction from federal officers that prevented [the defendant] from fulfilling its duties to the plaintiffs."); *see also Isaacson*, 517 F.3d at 137-38.

The case of *New Jersey Department of Environmental Protection v. Exxon Mobil Corp.*, 381 F. Supp. 2d 398 (D.N.J. 2005), provides persuasive support for my conclusion. In that case, the district court considered its federal officer removal jurisdiction over claims based on the defendant's waste disposal practices. The plaintiff had brought an action pursuant to a New Jersey statute for cleanup and removal costs, and also for damages allegedly caused by discharges at the defendant's property. *Id.* at 401. The defendant removed the action pursuant to § 1442(a), arguing that "certain of its production activities during World War II were at the behest of and under the control of the federal government, and these activities resulted in the disposal of products included in the conduct alleged against it . . . ." *Id.* The plaintiff sought remand, arguing that federal officer removal was inappropriate. Even if the defendants produced, stored, and transferred certain products under government control, the plaintiff argued, the government did not control the improper disposal of hazardous wastes. *Id.* at 404. Therefore, there was no causal nexus between the actions conducted under government control (the production, storage, and transfer of the products) and the conduct charged in its claim (the "improper disposal of toxic substances into the waters of the [s]tate . . . ."). *Id.*

The district court examined the case law presented by the parties and distinguished the defendant's cases. The district court observed that all of the defendant's cases were "personal injury products liability actions in which the actual *production* of toxic substances ordered by the government gave rise to the alleged harm." *Id.* at 404-05. The plaintiff, however, had provided cases alleging harms caused by the *disposal* of hazardous substances produced under government control. In those cases, the courts had rejected federal officer removal. *Id.* at 405.

The court specifically cited to two cases: *Bahrs v. Hughes Aircraft Co.*, 795 F. Supp. 965 (D.Ariz. 1992), and *Arness v. Boeing N. Am., Inc.*, 997 F. Supp. 1268 (C.D. Cal. 1998). In *Bahrs*, a plaintiff class brought suit alleging injuries caused by the defendants' alleged dumping of toxic substances and contamination of the plaintiffs' water supply. 795 F .Supp. at 967. One of the defendants was a military contractor that sought removal under § 1442(a). The district court explained that the defendant's government contract provided an insufficient basis for federal officer removal. It explained: "While the government officials were undoubtedly most interested in the production of war materials, the record before this Court does not demonstrate the government's necessary control over the method of waste disposal. The mere fact that the government possessed the power to exercise control over the project does not establish that the power was in fact ever exercised." *Id.* at 970.

In *Arness*, the plaintiffs brought suit against the defendants based on the defendants' "alleged release of [toxic chemicals] from their activities at [certain facilities] which allegedly resulted in the contamination of the surrounding area's groundwater, soil and subsurface oil." 997 F. Supp. at 1270. The plaintiffs alleged that the defendant's conduct exposed them to the toxic chemicals and they sought damages for injuries caused by that exposure. *Id.* The defendants asserted that they conducted activities at those facilities under government contracts and at "the direction of federal officers pursuant to detailed and comprehensive procedures dictated by these officers." *Id.* (quoting Barrett Decl. ¶ 5). Specifically, the defendants asserted that the government's production requirements mandated the flushing of rocket engines with the toxic chemicals that allegedly contaminated the surrounding environment. *Id.* at 1273. The district court observed, however, that the defendants' "use of [toxic chemicals] did not cause Plaintiffs' injuries. Rather, Plaintiffs'

-27-

injuries were allegedly caused by [the defendants'] negligent disposal and storage of [the chemicals], which activities were not performed at the government's behest." *Id.* at 1274-75. Moreover, the government's failure to specify storage and disposal practices for the toxic chemicals despite mandating their use could not establish a causal nexus. *Id.* at 1275. The court concluded that: "because the government did not specify safeguards that BNA must use, or restrict BNA's ability to implement safeguards, BNA was not acting under federal direction when it allegedly released the TCE. Rather, the acts relevant to Plaintiffs' suit occurred only 'under the general auspices of' a federal officer." *Id.* at 1275 (quoting *Fung*, 816 F. Supp. at 572). The court remanded the action.

The defendants cite to *Isaacson v. Dow Chemical Co.*, 517 F.3d 129 (2d Cir. 2008), to support their argument that there is a causal nexus between the federal control over the manufacturing at the Nitro Plant and the acts underlying the instant action. In *Isaacson*, the plaintiff sued on a theory of products liability. The plaintiff, a Vietnam War veteran, alleged that he was exposed to Agent Orange produced by the defendants while serving in that war and that the Agent Orange was contaminated by toxic dioxins. The Second Circuit identified a causal nexus between the Agent Orange production that occurred under federal direction and the production of dioxin: "[E]ven if Plaintiffs were to prove that the dioxin contamination occurred because of an act not specifically contemplated by the government contract, it is enough that the contracts gave rise to the contamination." *Id.* at 138.

But *Isaacson* is distinguishable. *Isaacson* was a products liability case based on the contamination of Agent Orange by dioxins. The defendants' actions underlying *Isaacson* was the manufacturing of Agent Orange itself, which was composed according to a government-specific formulation that was not also being provided to civilian contractors. The instant action is not a

products liability case.  The actions underlying the plaintiffs' claims in this case do not involve Agent Orange, or even 2, 4, 5-T production.  Instead, they involve the defendants' disposal of 2, 4, 5-T's toxic byproducts, and that disposal occurred without any federal involvement.  Accordingly, *Isaacson* does not support the defendants' argument that there is a causal nexus between the federal control over the manufacturing at the Nitro Plant and the acts underlying the instant action.

The above cases make clear that the government's control over certain aspects of production cannot provide a basis for federal officer removal for an action asserting claims solely based on the defendants' waste disposal practices because there is no causal nexus between the production activities conducted under government control and the disposal practices controlled by the defendant alone.  Therefore, the defendants in this matter cannot establish a basis for federal officer removal unless the defendants disposed of the 2, 4, 5-T waste under the direct and detailed control of the federal government or in furtherance of a specific request by a federal officer.

<div align="center">

ii.    **The Plaintiffs' Claim Based on the Defendants' Engagement in an Abnormally Dangerous Activity Does Not Establish A Causal Nexus Satisfying the Requirements for Federal Officer Removal**

</div>

The defendants argue, however, that the causal nexus requirement is satisfied by virtue of the plaintiffs' claim that the defendants' conduct constituted an "abnormally dangerous activity." (Notice Removal, Ex. 1, Corrected 4th Am. Compl. ¶ 27.)  The defendants assert that "[w]here a plaintiff argues that a defendant should be held liable because that defendant has engaged in some type of abnormally dangerous/ultrahazardous activity . . . it is enough to satisfy the causal nexus requirement that the basic activity itself was performed pursuant to a contract with the federal government."  (Defs.' Resp. Mot. Summ. J. Subject Matter Juris. 15.)  In support of this assertion,

<div align="center">-29-</div>

the defendants cite to *Campbell v. Brook Trout Coal LLC*, No. 2:07-cv-0651, 2008 WL 4415078 (S.D. W. Va. Sept. 25, 2008) (Copenhaver, J.).

In *Campbell*, the plaintiffs were employed by government contractors hired to demilitarize United States Army munitions containing a highly toxic substance. 2008 WL 4415078, at *1. The plaintiffs filed suit in state court and raised several claims based on their exposure to the toxic substance. In one of their claims, the plaintiffs alleged that the defendants were strictly liable for their injuries caused by exposure to "an ultra-hazardous product and working conditions." *Id.* at *5. After the defendants removed the case, the court determined that a causal connection existed between the defendants' actions pursuant to its federal government contract and the plaintiffs' exposure to the toxic substance because the plaintiffs' exposure occurred as a result of the defendants' duty under its contract. *Id.* at *6. In other words, a causal connection existed because the government contract itself required the defendants to hire the plaintiffs in positions where they would be exposed to the hazardous substances.

Though *Campbell* would be persuasive if the actions underlying the plaintiffs' abnormally dangerous activity claim were actions conducted pursuant to a federal government contract, that is not the case. The actions underlying the plaintiffs' claim are the disposal of 2, 4, 5-T toxic byproducts at the Manila Creek dump site.[10] As discussed above, the disposal of 2, 4, 5-T did not

---

[10] The plaintiffs clearly describe the "abnormally dangerous activity" in their Complaint as the "defendants' [aforesaid] conduct." (Notice Removal, Ex. 1, Corrected 4th Am. Compl. ¶ 27.) Unlike in *Campbell*, where the court found that the ultra-hazardous product claim was based on different conduct than the conduct underlying the other claims, the plaintiffs' "abnormally dangerous activity" claim in the instant matter is based on the same conduct that underlies all of the claims. I can find no grounds for finding that the plaintiffs have based this single claim on the defendants' production of 2, 4, 5-T (as the defendants allege) rather than the disposal practices that underlie the rest of their claims.

occur pursuant to a federal contract or under federal control. Moreover, there is no causal nexus between the defendants' production and distribution of 2, 4, 5-T under federal government control and their subsequent disposal of 2, 4, 5-T waste at the Manila Creek dump site. Accordingly, the fact that the disposal may have been an abnormally hazardous activity conducted by the defendant cannot establish grounds for federal officer removal.

Because I find that the defendants cannot establish a causal nexus between its actions pursuant to the control of the federal government and the actions underlying the plaintiffs' claims, I **FIND** that this matter was improperly removed under § 1442(a).[11]

### III.   Defendants' Removal Does Not Warrant The Imposition Of Fees And Costs

The plaintiffs argue that because the defendants misrepresented the scope of the plaintiffs' claims and because they could not provide evidence supporting federal officer removal, the defendants lacked any "objective or reasonable basis for asserting federal officer removal jurisdiction . . . ." (Pls.' Mem. Supp. Mot. Remand Subject Matter Juris. 17.) My discussion of this matter clearly demonstrates the complexity of the jurisdictional question in this case. I cannot find that the defendant "lacked an objective, reasonable basis for their removal." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005). The Plaintiffs' request to recover costs and attorneys fees is **DENIED**.

### IV.   Conclusion

For the reasons stated, the  plaintiffs' Motion to Remand for Lack of Subject Matter Jurisdiction [Docket 35] is **GRANTED** but their request for costs and attorneys fees is **DENIED**.

---

[11]  Because I have found that federal officer removal is inappropriate based on the absence of a causal nexus, I will not address either parties' arguments regarding whether the defendants can present a colorable government contractor defense.  (Pls.' Reply at 9-10.)

The Motion to Remand for Voluntary Dismissal or in the Alternative for Voluntary Dismissal [Docket 50] is also **DENIED**. This action is **REMANDED** to the Circuit Court of Putnam County, West Virginia. The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party, and a certified copy of this Order to the Circuit Court Clerk of Putnam County, West Virginia.

ENTER:      June 19, 2009

Joseph R. Goodwin, Chief Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### HUNTINGTON DIVISION

WILLIAM TOLLEY, et al.,

                Plaintiffs,

v.                                     CIVIL ACTION NO. 3:08-cv-01305

MONSANTO COMPANY, et al.,

                Defendants.

---

MARY LOU BREWER,

                Plaintiff,

v.                                     CIVIL ACTION NO. 3:08-cv-01306

MONSANTO COMPANY, et al.,

                Defendants.

---

EVERETTE HEDRICK,

                Plaintiff,

v.                                     CIVIL ACTION NO. 3:08-cv-01307

MONSANTO COMPANY, et al.,

                Defendants.

---

CHRIS MORRIS,

                Plaintiffs,

v.                                     CIVIL ACTION NO. 3:08-cv-01308

MONSANTO COMPANY, et al.,

                Defendants.

---

**EXHIBIT**

**17**

ROBERT HEDRICK,

          Plaintiff,

v.                                CIVIL ACTION NO.  3:08-cv-01309

MONSANTO COMPANY, et al.,

          Defendants.

---

SANDRA PARRI,

          Plaintiff,

v.                                CIVIL ACTION NO.  3:08-cv-01310

MONSANTO COMPANY, et al.,

          Defendants.

---

MARY HEDRICK,

          Plaintiff,

v.                                CIVIL ACTION NO.  3:08-cv-01311

MONSANTO COMPANY, et al.,

          Defendants.

---

CLAUDE PAULEY,

          Plaintiff,

v.                                CIVIL ACTION NO.  3:08-cv-01312

MONSANTO COMPANY, et al.,

          Defendants.

LESLIE JACKSON,

        Plaintiff,

v.                                CIVIL ACTION NO.  3:08-cv-01313

MONSANTO COMPANY, et al.,

        Defendants.

---

ROBERTA JENKINS,

        Plaintiff,

v.                                CIVIL ACTION NO.  3:08-cv-01314

MONSANTO COMPANY, et al.,

        Defendants.

---

KENNETH PHILLIPS,

        Plaintiff,

v.                                CIVIL ACTION NO.  3:08-cv-01315

MONSANTO COMPANY, et al.,

        Defendants.

---

MAGGIE CONNER,

        Plaintiff,

v.                                CIVIL ACTION NO.  3:08-cv-01316

MONSANTO COMPANY, et al.,

        Defendants.

RUBEN JOHNSON,

                Plaintiff,

v.                            CIVIL ACTION NO.  3:08-cv-01317

MONSANTO COMPANY, et al.,

                Defendants.

---

ARLEN BAILEY,

                Plaintiff,

v.                            CIVIL ACTION NO.  3:08-cv-01318

MONSANTO COMPANY, et al.,

                Defendants.

---

GORDON POTTORFF,

                Plaintiff,

v.                            CIVIL ACTION NO.  3:08-cv-01319

MONSANTO COMPANY, et al.,

                Defendants.

---

WILLIAM BAILEY,

                Plaintiff,

v.                            CIVIL ACTION NO.  3:08-cv-01320

MONSANTO COMPANY, et al.,

                Defendants.

-4-

FERRIEL CRAIGO,

        Plaintiff,

v.                             CIVIL ACTION NO.  3:08-cv-01321

MONSANTO COMPANY, et al.,

        Defendants.

---

JAMES RANDOLPH,

        Plaintiff,

v.                             CIVIL ACTION NO.  3:08-cv-01322

MONSANTO COMPANY, et al.,

        Defendants.

---

LEONARD LETT,

        Plaintiff,

v.                             CIVIL ACTION NO.  3:08-cv-01323

MONSANTO COMPANY, et al.,

        Defendants.

---

HERMAN BARTLETT,

        Plaintiff,

v.                             CIVIL ACTION NO.  3:08-cv-01324

MONSANTO COMPANY, et al.,

        Defendants.

DONALD RAYNES,

         Plaintiff,

v.                                CIVIL ACTION NO.  3:08-cv-01325

MONSANTO COMPANY, et al.,

         Defendants.

ROBERT CREMERING,

         Plaintiff,

v.                                CIVIL ACTION NO.  3:08-cv-01326

MONSANTO COMPANY, et al.,

         Defendants.

WALTER LOVELESS,

         Plaintiff,

v.                                CIVIL ACTION NO.  3:08-cv-01327

MONSANTO COMPANY, et al.,

         Defendants.

CURTIS BLACKSHIRE,

         Plaintiff,

v.                                CIVIL ACTION NO.  3:08-cv-01328

MONSANTO COMPANY, et al.,

         Defendants.

STANLEY FARLEY,

        Plaintiff,

v.                                   CIVIL ACTION NO. 3:08-cv-01329

MONSANTO COMPANY, et al.,

        Defendants.

---

VIRGINIA BOARD,

        Plaintiff,

v.                                   CIVIL ACTION NO. 3:08-cv-01330

MONSANTO COMPANY, et al.,

        Defendants.

---

MARY REUSCH,

        Plaintiff,

v.                                   CIVIL ACTION NO. 3:08-cv-01331

MONSANTO COMPANY, et al.,

        Defendants.

---

ELLEN MANN,

        Plaintiff,

v.                                   CIVIL ACTION NO. 3:08-cv-01332

MONSANTO COMPANY, et al.,

        Defendants.

---

LLOYD BOGGESS,

              Plaintiff,

v.                               CIVIL ACTION NO.  3:08-cv-01333

MONSANTO COMPANY, et al.,

              Defendants.

---

OLIN MCCLANAHAN,

              Plaintiff,

v.                               CIVIL ACTION NO.  3:08-cv-01334

MONSANTO COMPANY, et al.,

              Defendants.

---

GARY FISHER,

              Plaintiff,

v.                               CIVIL ACTION NO.  3:08-cv-01335

MONSANTO COMPANY, et al.,

              Defendants.

---

RALPH SCARBERRY,

              Plaintiff,

v.                               CIVIL ACTION NO.  3:08-cv-01336

MONSANTO COMPANY, et al.,

              Defendants.

---

MARGARET FRAZIER,

        Plaintiff,

v.                               CIVIL ACTION NO.  3:08-cv-01337

MONSANTO COMPANY, et al.,

        Defendants.

---

JAMES BONNETT,

        Plaintiff,

v.                               CIVIL ACTION NO.  3:08-cv-01338

MONSANTO COMPANY, et al.,

        Defendants.

---

JANICE SCOTT,

        Plaintiff,

v.                               CIVIL ACTION NO.  3:08-cv-01339

MONSANTO COMPANY, et al.,

        Defendants.

---

RANDY SMITH,

        Plaintiff,

v.                               CIVIL ACTION NO.  3:08-cv-01340

MONSANTO COMPANY, et al.,

        Defendants.

---

STEPHEN GILLISPIE,

        Plaintiff,

v.                                CIVIL ACTION NO.  3:08-cv-01341

MONSANTO COMPANY, et al.,

        Defendants.

---

RALPH TURLEY,

        Plaintiff,

v.                                CIVIL ACTION NO.  3:08-cv-01342

MONSANTO COMPANY, et al.,

        Defendants.

---

STERLING SMITH,

        Plaintiff,

v.                                CIVIL ACTION NO.  3:08-cv-01343

MONSANTO COMPANY, et al.,

        Defendants.

---

TERRY BRADSHAW,

        Plaintiff,

v.                                CIVIL ACTION NO.  3:08-cv-01344

MONSANTO COMPANY, et al.,

        Defendants.

DENCIL HARRISON,

        Plaintiff,

v.                                CIVIL ACTION NO.  3:08-cv-01345

MONSANTO COMPANY, et al.,

        Defendants.

---

GALE SUMMERS,

        Plaintiff,

v.                                CIVIL ACTION NO.  3:08-cv-01346

MONSANTO COMPANY, et al.,

        Defendants.

---

JAMES TOTTEN, SR.,

        Plaintiff,

v.                                CIVIL ACTION NO.  3:08-cv-01347

MONSANTO COMPANY, et al.,

        Defendants.

---

DELBERT HAWLEY,

        Plaintiff,

v.                                CIVIL ACTION NO.  3:08-cv-01348

MONSANTO COMPANY, et al.,

        Defendants.

HARVEY BRIGHTWELL,

        Plaintiff,

v.                                CIVIL ACTION NO.  3:08-cv-01349

MONSANTO COMPANY, et al.,

        Defendants.

TAMMY CHANCEY,

        Plaintiff,

v.                                CIVIL ACTION NO.  3:08-cv-01350

MONSANTO COMPANY, et al.,

        Defendants.

LINDA TURLEY-FRANEZAK,

        Plaintiff,

v.                                CIVIL ACTION NO.  3:08-cv-01351

MONSANTO COMPANY, et al.,

        Defendants.

MARY WARD,

        Plaintiff,

v.                                CIVIL ACTION NO.  3:08-cv-01352

MONSANTO COMPANY, et al.,

        Defendants.

DEVAE WILLIAMS,

        Plaintiff,

v.                          CIVIL ACTION NO.  3:08-cv-01353

MONSANTO COMPANY, et al.,

        Defendants.

---

JACK WOODALL,

        Plaintiff,

v.                          CIVIL ACTION NO.  3:08-cv-01354

MONSANTO COMPANY, et al.,

        Defendants.

---

GAYNELLE TYREE,

        Plaintiff,

v.                          CIVIL ACTION NO.  3:08-cv-01355

MONSANTO COMPANY, et al.,

        Defendants.

---

KEITH WITHROW,

        Plaintiff,

v.                          CIVIL ACTION NO.  3:08-cv-01356

MONSANTO COMPANY, et al.,

        Defendants.

-13-

LEWIS FARMER,

            Plaintiff,

v.                                     CIVIL ACTION NO.  3:08-cv-01357

MONSANTO COMPANY, et al.,

            Defendants.

ZINA G. BIBB,

            Plaintiff,

v.                                     CIVIL ACTION NO.  3:08-cv-01358

MONSANTO COMPANY, et al.,

            Defendants.

ROBERT C. CARTER,

            Plaintiff,

v.                                     CIVIL ACTION NO.  3:08-cv-01359

MONSANTO COMPANY, et al.,

            Defendants.

## ORDER

Pending before the court are the defendants' Letter-Form Motion to Stay Proceedings

[Docket 6],[1] the Plaintiffs[2] Motion to Stay Transfer of this Case and Other "Parallel Litigations"

---

[1]     Unless otherwise noted, filings and documents referenced in this Order are from *Carter et al. v. Monsanto Co. et al.*, No. 3:08-cv-01359.  The same documents have been filed in all of the above-styled cases.

[2]     I will refer to all of the plaintiffs in the above-styled cases as "Plaintiffs" throughout
(continued...)

-14-

Pending the Court's Consideration of Plaintiffs' Motion to Remand [Docket 7], and the Plaintiffs' Motion to Remand Due to Untimely Removal and to Recover Costs and Attorneys Fees [Docket 9]. For the reasons discussed herein, the Letter-Form Motion to Stay Proceedings is **DENIED**, the Motion to Stay Transfer of this Case is **DENIED as moot**, and the Motion to Remand is **GRANTED in part** and **DENIED in part**.

## I. Factual and Procedural Background

The above-styled cases are parallel personal injury actions (collectively, the "Parallel Litigations")[3] seeking damages based on Defendant Monsanto's alleged release of the agricultural herbicide 2, 4, 5-trichlorophenoxyacetic acid ("2, 4, 5-T") and toxic byproducts from its chemical plant in Nitro, West Virginia (the "Nitro Plant"). Defendant Monsanto[4] began producing 2, 4, 5-T at the Nitro Plant in 1948 and continued producing the herbicide until about 1971. During the Vietnam War, Defendant Monsanto sold herbicide 2, 4, 5-T to the federal government to be used as a primary active component of the military herbicide Agent Orange. (Notice Removal, Ex. A, Corrected Fourth Am. Compl. ¶ 7.) The production of 2, 4, 5-T, however, results in the formation of a toxic byproduct called 2, 3, 7, 8-tetracholorodibenzoparadioxin, or "dioxin," and also dibenzo

---

[2](...continued)
this order. Further, because the Plaintiffs filed the same motions, I will credit them collectively for their allegations and arguments. I will distinguish cases and parties when necessary.

[3]     The Parallel Litigations are made up of two class action lawsuits and fifty-three individual cases. (Letter to District Court Judge, Tab A [Docket 6].) The plaintiffs in all of the Parallel Litigations are represented by the same counsel, and the same three motions are pending in all of the cases and raise the same issues. Accordingly, this Order will apply to all of the above-styled cases.

[4]     The other defendants in the Parallel Litigations have been sued as owners and operators of the Nitro Plant, or as successors to the liabilities of companies that owned or operated the plant during the relevant time period.

furans (collectively "dioxins/furans"). (Notice Removal, Ex. 1, Class Action Compl. ¶ 2, *Bibb et al. v. Monsanto Co. et al.*, No. 3:08-cv-01358 (S.D. W. Va. filed Nov. 21, 2008).) The production of 2, 4, 5-T, and the resulting production of dioxins/furans, allegedly caused injury not only to Monsanto workers involved in the production process, but also persons living near the Nitro Plant and dioxin/furan waste disposal sites. (Notice Removal, Ex. A, Corrected Fourth Am. Compl. ¶ 8-21.)

The Plaintiffs seek damages for injuries caused by exposure to dioxins/furans produced during the 2, 4, 5-T manufacturing process at the Nitro Plant. The Parallel Litigations include two class actions: *Carter et al. v. Monsanto Co. et al.*, No. 3:08-cv-1359 (hereinafter "*Carter*") and *Bibb et al. v. Monsanto Co. et al.*, No. 3:08-cv-1358 (hereinafter "*Bibb*"). *Carter* and *Bibb* were filed in the Circuit Court of Putnam County, West Virginia in August 2000 and December 2004, respectively. (Notice of Removal 1; *Bibb* Notice of Removal 1; [Docket 1].) On January 7, 2008, the Circuit Court entered orders certifying classes in both cases. (Notice of Removal, Ex. 2; *Bibb* Notice of Removal, Ex. 3.) The Parallel Litigations also include fifty-three individual actions (hereinafter, "the Individual Litigations") which were filed in the Circuit Court of Putnam County on October 1, 2007. In all but two of the Individual Litigations, the individual plaintiffs filed amended complaints on January 24, 2008.[5]

On November 21, 2008, the defendants removed the Parallel Litigations to this court pursuant to 28 U.S.C. §§ 1442(a)(1) and 1331. Section 1442 allows the removal of any state action against federal officers acting "under color of such office" to federal district court. 28 U.S.C. §

---

[5]     The two cases in which amended complaints were not filed are: *Tolley et al. v. Monsanto Co. et al.*, No. 3:08-cv-01305, and *Brewer v. Monsanto Co. et al.*, No. 3:08-cv-1306.

1442(a)(1). The defendants argue that removal is appropriate under this provision because Monsanto produced 2, 4, 5-T under "federal direction and control" and can assert "federal defenses sufficient for removal." (Notice Removal 5-6.) The defendants also assert that this court has original jurisdiction under § 1331 because the "[Plaintiffs'] right to relief necessarily depends on resolution of a substantial question of federal law." (*Id.* (quoting *Christianson v. Colt Indus.*, 486 U.S. 800, 808 (1988) (internal quotations omitted) (alteration in original).) Finally, the defendants argue that removal of these cases is timely because the Plaintiffs revealed a new theory of the case on October 31, 2008 that "render[ed] this litigation (and the Parallel Litigations) ripe for removal." (Notice Removal 3, 8.)

On that same day, the defendants asked the Judicial Panel on Multidistrict Litigation (the "MDL Panel") to transfer the Parallel Litigations, now removed to federal court, to the United States District Court for the Eastern District of New York for consolidated pretrial proceedings as part of *In re "Agent Orange" Product Liability Litigation*, MDL No. 381. (Letter to District Judge, Tab B [Docket 6].) Also on that day, defense counsel filed a letter-form motion[6] requesting that "no action be taken by the Court in these cases pending a transfer decision by the MDL Panel." (Letter to District Judge.)

Between November 24 and December 1, 2008, the plaintiffs filed Motions to Remand in all of the Parallel Litigations. In their motions, the Plaintiffs argue that the defendants' removal of the Parallel Litigations was untimely because the defendants were aware of the "new" theory of the case upon which the removal was premised long before October 31, 2008. (Mot. Remand 2-7.) They

---

[6] In my Order filed on December 5, 2008, I indicated that the letter filed by the defendants on November 21, 2008 would be treated as a letter-form motion. (Order, Dec. 5, 2008, at 4 [Docket 14]).

further argue that the defendants' argument asserting timely removal is frivolous and move for the recovery of attorneys' fees and costs. (*Id.* at 7-8.) Also between November 24 and December 2, 2008, the Plaintiffs filed Motions to Stay Transfer of this Case and Other "Parallel Litigations" Pending the Court's Consideration of Plaintiffs' Motion to Remand.

On December 5, 2008, I entered an order in which I recognized that "the removal of these cases imposes a tremendous burden on the plaintiffs and has significant implications for judicial economy." (Order, Dec. 5, 2008 at 4 [Docket 14].) Consequently, I ordered the parties to follow a shortened briefing schedule. (*Id.*) The parties followed the Order, and the three pending motions are now ripe. I will address each in turn.

## II. Defendants' Letter-Form Motion to Stay Proceedings

In the defendants' letter dated November 21, 2008, the defendants notified this court that they had requested the transfer of the Parallel Litigations to MDL No. 381 and also "request[ed] that no action be taken by the Court in these cases pending a transfer decision by the MDL Panel." (Letter to District Judge.) In support of their request, the defendants noted that, upon transfer, the cases "will have the benefit of the extensive discovery materials and prior pretrial proceedings in MDL No. 381" and also that most courts facing similar circumstances "have not taken any action prior to transfer." (*Id.*)

In response, the Plaintiffs argue that this court should not stay its proceedings because "the issues raised in the Plaintiffs' Motion for Remand are both uncomplicated and unique to the cases at bar. Thus, nothing would be gained by delaying consideration of these issues . . . ." (Pls.' Resp. Defs.' Letter-Form Mot. Stay 4 [Docket 13].) The Plaintiffs also relate the long history and

-18-

procedural progress of the Parallel Litigations in state court and argue that a transfer of the cases would "create an enormous hardship on the Plaintiffs."

The defendants reply by arguing that "the interests of judicial economy and efficiency are best served if this Court stays all proceedings and defers a decision on the Motions to Remand until the [MDL Panel] renders its transfer decision." (Defs.' Reply Letter-Form Motion Stay 4 [Docket 16].) They also observe that they are not aware of any district court that "has ever intervened to remand during the pendency of the [MDL Panel] proceedings." (*Id.* at 4.)

The pendency of transfer to MDL No. 381 proceeding does not limit the authority of this court to rule on the plaintiff's motion to remand. *See JPML R. 1.5*; *Gen. Elec. Co. v. Byrne*, 611 F.2d 670, 673 (7th Cir. 1979) ("The mere pendency of a motion to transfer before the Multidistrict Panel does not affect or suspend the jurisdiction of the transferor court, or limit its ability to act on matters properly before it."). The decision whether to grant a stay is within the inherent power of the court and is discretionary. *See Landis v. North Am. Co.*, 299 U.S. 248, 254-55 (1936). Although some courts have opted to rule on pending motions to remand prior to the MDL Panel's decision on transfer, *see, e.g.*, *Kantner v. Merck & Co., Inc.*, No. 1:04CV2044, 2005 WL 277688 (S.D. Ind. Jan. 26, 2005), others have chosen to grant a stay, even if a motion to remand has been filed. *See, e.g.*, *Gavitt v. Merck & Co., Inc.*, No. 2:08-cv-755, 2008 WL 4642782 (M.D. Fla. 2008). A stay is particularly appropriate "[i]f the issues involved in the remand motion are likely to arise in the cases that have been or will be transferred, [because] judicial economy would be served by issuing the stay." *Meyers v. Bayer AG*, 143 F. Supp. 1044, 1049 (E.D. Wis. 2001). Nevertheless, a motion to dismiss or to remand, if it "rais[es] issues unique to a particular case, may be particularly

appropriate for resolution before the [MDL] Panel acts on the motion to transfer." *Manual for Complex Litigation (Fourth)* § 20.131 at 221.

In considering the defendants' Motion to Stay, I must consider three factors including: "(1) the interests of judicial economy; (2) hardship and equity to the moving party if the action is not stayed; and (3) potential prejudice to the non-moving party." *Meyers*, 143 F. Supp. 2d at 1049. First, I consider the interests of judicial economy. The issues involved in the pending Motion to Remand are unique because the parties dispute the timeliness of the removal, and the motion requires an evaluation of the specific papers and proceedings in the Parallel Litigations. Such an evaluation is not relevant to any other case in MDL No. 381. No judicial efficiencies will be achieved by reserving this question for adjudication in that forum.

Furthermore, a stay in the Parallel Litigation proceedings will significantly prejudice the Plaintiffs. Some of the Plaintiffs had been litigating the Parallel Litigations in state court for more than eight years when they were removed. *Bibb* and *Carter* were removed right before the scheduling of class notification and trial. A stay in this court's proceedings will delay the resolution of those class actions, and all of the Parallel Litigations, pending the MDL Panel's decision, and delay relief to the Plaintiffs, some of whom have been waiting for that relief for almost a decade. This prejudice outweighs any hardship that the defendants will suffer from being required to litigate the pending motion immediately before this court rather than later before the MDL Panel. I **FIND** that a stay of the proceedings in this court will not promote the interests of judicial economy and will prejudice the plaintiffs. I also **FIND** that the defendants' will not experience undue hardship if the proceedings are not stayed. Therefore, the defendants' Letter-Form Motion to Stay is **DENIED**.

### III. Plaintiffs' Motion to Remand

The Plaintiffs argue that the removal of the Parallel Litigations was untimely. They argue that under 28 U.S.C. § 1446, the defendants were required to remove the Parallel Litigations within thirty days after ascertaining grounds for removal. They further assert that the defendants knew of grounds for federal officer removal under 28 U.S.C. § 1442 more than thirty days before they filed the notices of removal. They therefore argue that the notices were untimely, and that all of the Parallel Litigations must be remanded.

#### A. Procedure for Filing a Notice of Removal

A defendant seeking to remove a case must file a notice of removal within thirty days of receiving the plaintiff's initial pleading. 28 U.S.C. § 1446(b). The receipt of an initial pleading starts the thirty-day period, however, only where the initial pleading reveals a ground for removal. *Lovern v. Gen. Motors Corp.*, 121 F.3d 160, 162 (4th Cir. 1997). Where details that would make a case removable are obscured, omitted, or misstated in an initial pleading, the thirty-day period begins to run when a defendant receives "a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." 28 U.S.C. § 1446(b); *Lovern*, 121 F.3d at 162. The burden of establishing that removal was timely is on the defendant. *McPatter v. Sweitzer*, 401 F. Supp. 2d 468, 472 (M.D.N.C. 2005).

"The 'motion, order or other paper' requirement is broad enough to include any information received by the defendant, 'whether communicated in a formal or informal manner.'" *Yarnevic v. Brink's, Inc.*, 102 F.3d 753, 755 (4th Cir. 1996). This court has previously recognized that "the term 'other paper' has been construed to include, for example, requests for admissions, deposition testimony, settlement offers, answers to interrogatories, briefs, and product identification documents

given in discovery." *Roberts v. Anchor Packing Co.*, Case No. 2:05-cv-320, 2005 WL 1201212, at *1 (S.D. W. Va. May 19, 2005) (Goodwin, J.); *see also* 14C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3732 (3d ed. 1998) ("Various discovery documents such as depositions, answers to interrogatories and requests for admissions, amendments to ad damnum clauses of the pleadings, and correspondence between the parties and their attorneys or between the attorneys usually are accepted as 'other paper' sources that initiate a new thirty-day period of removability.").

In determining whether the grounds for removal were ascertainable from a motion, order or other paper, a court must not inquire into the subjective knowledge of the defendant. *Lovern*, 121 F.3d at 163. Instead, the court must "rely on the face of the initial pleading and on the documents exchanged in the case by the parties . . . [and] requir[e] that those grounds be apparent within the four corners of the initial pleading or subsequent paper." *Id.* When removal is based on a defendant's status as a federal officer pursuant to 28 U.S.C. § 1442, the thirty-day period is only triggered if the paper "contains unequivocal facts that alert the defendant to a claim of federal officer jurisdiction." *In re MTBE Products Liability Litig.*, 399 F. Supp. 2d 356, 365 (S.D.N.Y. 2005).

A defendant does not have an affirmative duty to "scrutinize" a complaint in search of grounds for removal. *Shonk Land Co., LLC v. Ark Land Co.*, 170 F. Supp. 2d 660, 662 (S.D. W. Va. 2001). Nevertheless, a defendant may be on notice of grounds for removal, even if the plaintiff's complaint is "vague." *See Scott v. Grennier*, 858 F. Supp. 607, 610 (S. D. W. Va. 1994); *see also Shonk Land Co.*, 170 F. Supp. 2d at 663 (explaining that the thirty-day clock for removal began to run upon receipt of a complaint that provides a "clue" to removability). Moreover, a court should not allow "the extension of the removal period in the case where the initial pleading does not state

the factual or legal bases for removal" and the defendant uses the absence of such bases "to cover strategic delay interposed . . . in an effort to determine the state court's receptivity to his litigating position." *Lovern*, 121 F.3d at 163; *Shonk Land Co.*, 170 F. Supp. 2d at 662.

It is undisputed that the defendants removed the Parallel Litigations to this court more than thirty days after receiving the initial pleadings in those cases.[7] The defendants argue, however, that on October 31, 2008, they received the plaintiffs' Response in Opposition to the Rule 16 Motion ("Response in Opposition"), an "other paper" revealing a "new theory" of the plaintiffs' case that rendered the Parallel Litigations ripe for removal. (Notice Removal 2-3.) The Response in Opposition allegedly showed, for the first time, that the plaintiffs were intending to "emphasize production-related injuries," rather than just "disposal-related" injuries. (*Id.* at 2.) Because the defendants *produced* 2, 4, 5-T "under the aegis of the federal government and as a federal officer for the production of military herbicides," the plaintiffs' revelation that they would pursue this theory suddenly rendered the cases removable.[8] (*Id.* at 3.)

---

[7]  The defendants removed the Parallel Litigations to federal court more than eight years after *Carter* was filed, more than four years after *Bibb* was filed, and more than one year after the fifty-three individual cases were filed, all in the Circuit Court of Putnam County, West Virginia.

[8]  The plaintiffs have argued that the defendants make merely a semantic distinction between 2, 4, 5-T *production* and *disposal*. (Pls.' Mem. Supp. Mot. Remand 3 n.3.) Other courts, however, evaluating federal officer removal under § 1442(a)(1) have found the distinction significant for the purposes of determining whether a defendant was acting under federal control. *See N.J. Dep't of Envtl Prot. v. Exxon Mobil Corp.*, 381 F. Supp. 2d 398, 404-05 (D.N.J. 2005). Moreover, the plaintiffs have not presented any evidence that the federal government controlled Monsanto's 2, 4, 5-T disposal practices in the instant matter. Nor have they identified any cases where other courts have reached that conclusion in similar situations. Instead, they focus their remand argument on the theory that the defendants had notice of the production-based claims more than thirty days before the removal. In the absence of argument or evidence that I should consider notice of the disposal-based claims as grounds for § 1442 removal, I will address the narrow question of when the defendants first had notice of production-based claims.

The defendants explain that the complaints in the Parallel Litigations did not demonstrate grounds for removal because complaints must "reveal[] . . . that the specific activities alleged to have proximately caused Plaintiff's injuries were the very activities directed by the federal government." (Defs.' Opp. Pls.' Mot. Remand 13.)  According to the defendants, the Complaint only "recites" that production occurred and does not allege that the "production activities are the direct and proximate cause of the injuries alleged." (*Id.*)  The Plaintiffs argue that the complaints did allege injuries based on 2, 4, 5-T production. (Pls.' Mem. Supp. Mot. Remand 6-7).  To resolve this question, I will examine the complaints from the Parallel Litigations to determine whether they notified the defendants of grounds for federal officer jurisdiction.

### B. *Carter* Litigation

The *Carter* plaintiffs filed their Fourth Amended Complaint (hereinafter, "*Carter* Complaint") in the Circuit Court of Putnam County on July 31, 2006.  That Complaint indicates that the alleged injuries stemmed from Monsanto's disposal of chemical waste from the Nitro Plant.  The first indication appears where the *Carter* plaintiffs allege that: "At all relevant times, the defendants each had ownership, possession control and/or the right to control of the dump sites identified herein." (Notice Removal, Ex. 1 ¶ 4.)  The *Carter* Complaint discusses 2, 4, 5-T production for the purpose of explaining the source of "wastes contaminated with dioxin" and alleging that the Defendant Monsanto's continued use of a production process that produced dioxins "in spite of available technology that would have eliminated and/or greatly reduced the generation of waste dioxin in its manufacturing process." (*Id.* ¶ 9.)  The *Carter* plaintiffs then allege that: "[D]espite its knowledge of the health hazards posed by dioxin, Monsanto began disposing of and/or arranging for the disposal of large quantities of waste material contaminated with its dioxin . . . at various

-24-

locations, including the Manila Creek Dump site . . . ." (*Id.* ¶ 10.) Next, the plaintiffs allege that: "From the 1950s into the 1980s, Monsanto failed to advise local residents that it had dumped large quantities of dioxin and other chemicals it knew to be hazardous at [the Manila Creek dump site]." (*Id.* ¶ 11.) The next several paragraphs discuss the contamination at the Manila Creek site and the offsite dioxin contamination, including surface water and property contamination, caused by the waste at the Manila Creek site. (*Id.* ¶¶ 14-19.) The rest of the Complaint asserts claims based on this contamination.

The injuries alleged in the *Carter* Complaint clearly stem from Monsanto's *disposal* of dioxin contaminated waste at the Manila Creek site and the subsequent leaching of dioxin into neighboring waterways and property. The *Carter* plaintiffs did not allege any injuries based on the 2, 4, 5-T production process itself. I **FIND** that the *Carter* Complaint did not provide the defendants with grounds for § 1442 federal officer removal.

### C. *Bibb* Litigation

The *Bibb* plaintiffs filed their Class Action Complaint (hereinafter, "*Bibb* Complaint") on December 16, 2004. (*Bibb* Notice Removal, Ex. 1, Class Action Complaint.)[9] The differences between the *Bibb* Complaint and the *Carter* Complaint are striking. Though the *Bibb* plaintiffs also assert claims based on contamination from dioxins/furans produced at the Nitro Plant (*Bibb* Complaint ¶ 3), they clearly state that their "claims arise from [Monsanto's] production of the . . . dioxins/furans contaminated herbicide 2, 4, 5-T at . . . [the Nitro Plant] during the period 1949 through approximately 1971." (*Bibb* Complaint ¶ 8.) The emphasis on *production* as the cause of injury persists throughout many paragraphs. For example:

---

[9]        Hereinafter cited as "*Bibb* Complaint."

17. . . . Plaintiffs complain that the defendants have caused the inside of their homes and their real property to be contaminated with dioxin/furans generated by the defendants' contaminated 2, 4, 5-T process at the Nitro plant.

. . . .

44. From 1949 until 1971, [Monsanto] produced 2, 4, 5-T on a continuous basis in its [Nitro Plant]. Each and every ounce and each and every molecule of this product had associated with its contaminants the aforesaid dioxins/furans.

. . . .

46. The production of dioxin contaminated 2, 4, 5-T continued 7 days a week 365 days a year from 1949 to approximately 1971 at the [Nitro Plant]. During this entire time period, dioxin contaminated dust was released to the atmosphere by [Monsanto] where it was carried by prevailing winds over the town of Nitro, surrounding communities and the plaintiffs' homes and businesses.

(*Bibb* Complaint ¶¶ 17, 44, 46.)

The *Bibb* Complaint does go on to discuss offsite dioxin/furan contamination caused by dump sites and the Nitro Plant site itself, which was dismantled and buried in 1972. (*Bibb* Complaint ¶¶ 47-50.) In presenting the class allegations, however, the plaintiffs again emphasize the continuous and collective contamination caused by Monsanto's activities. For example:

105. For the purposes of identifying the plaintiffs at risk for contamination, the plant site, due to the prevailing winds and natural topography, is located at the center of a wind and topographically defined arc within which the deposition of contaminated dust and fumes escaping at all relevant times from the plant property fell upon and otherwise entered and contaminated plaintiffs' real estate . . . .

. . . .

107. Defendant's operation of the 2, 4, 5-T process and other related processes from approximately 1949 to 1971 caused the neighborhoods in the vicinity of the plant to become contaminated with the aforesaid dioxins/furans during that time period. . . .

108. As a consequence of the operation of the 2, 4, 5-T process, the plant site and adjacent real estate became heavily contaminated with dioxins/furans.

. . . .

-26-

151. Since 1949 [the defendants] . . . created and maintained a nuisance on the [Nitro Plant], to wit: the defendants through their manufacturing processes caused to be created the aforesaid dioxins/furans.

. . . .

153. Because the defendants knew or should have known that their conduct in producing the aforesaid dioxins/furans and causing them to escape the Nitro Plant site was causing a substantial and unreasonable interference with the [plaintiffs'] interests in the use and safe enjoyment of their respective real estate, the defendants' conduct . . . constitutes an intentional and actionable nuisance.

. . . .

163. . . . [T]he production of dioxin is an abnormally dangerous activity . . . .

. . . .

166. Because the defendants created an abnormally dangerous condition and because the defendants engaged in an abnormally dangerous activity, the defendants are strictly liable to the [plaintiffs] for any harm and injury proximately caused by the abnormally dangerous dioxins/furans.

(*Bibb* Complaint ¶¶ 105, 107, 108, 151, 153, 163, 166.)

These paragraphs show a breadth of claims much wider than those alleged in *Carter*, and further, implicate the defendants' activities other than the waste disposal. Paragraphs 107 and 108, indicate that the plaintiffs are alleging claims for injuries caused by multiple Nitro Plant processes, rather than only waste disposal processes. Paragraphs 153 and 166 explicitly allege the manufacturing and production process to be the sources of the defendants' liability.

A plain reading of the *Bibb* Complaint shows that the collective and continuous operation of the Nitro Plant in producing 2, 4, 5-T, including production, disposal, and any other process that was part of the plant operation, led to the emission of the dioxins/furans that allegedly caused the plaintiffs injuries. It is unequivocal that the plaintiffs' claims include those based on production processes controlled by the federal government. There is no indication in the *Bibb* Complaint that

-27-

the plaintiffs' claims were limited to injuries caused by damages related to Monsanto's waste disposal practices. At worst the Complaint was "vague" about the specific activity causing the emissions. But even so, it provided at least some "clue" that the plaintiffs were asserting claims based on production and that the Parallel Litigations could be removed under 28 U.S.C. § 1442. *See Shonk Land Co.*, 170 F. Supp. 2d at 663. Identifying the production-based claims in this complaint hardly requires "divination," *(See* Defs.' Mem. Opp. Mot. Remand 12), nor even fastidious "scrutiny." *See Shonk Land Co.*, 170 F. Supp. 2d at 662. The claims are evident on the face of the Complaint. *See Lovern*, 121 F.3d at 163.

The defendants try to excuse their superficial reading of the *Bibb* Complaint by arguing that their interpretation of the *Bibb* Complaint was informed by *Carter*. They argue that *Carter* had already been in litigation for four years when *Bibb* was filed, and because *Carter* was focused on waste disposal practices, "[i]t was . . . reasonable for anyone reading the *Bibb* Complaint to assume that *Bibb*, like *Carter*, also was premised upon Monsanto's waste disposal practices." (Defs.' Mem. Opp. Pls.' Mot. Remand 14.) This argument is unpersuasive. First, grounds for removal are to be discerned from the four corners of a "paper," not based on any subjective assumptions. *See Lovern*, 121 F.3d at 163. Second, rather than raising the assumption that *Bibb* was the same as *Carter*, the differences between the *Bibb* and *Carter* Complaints should have given the defendants a "clue" that the *Bibb* claims were different and broader.

The defendants further argue that this court must construe 28 U.S.C. § 1442 broadly. It is true that courts construe § 1442 more liberally than other removal statutes. (Defs.' Mem. Opp. Pls.' Mot. Remand 7.) Generally, courts should construe removal jurisdiction strictly because of the significant federalism concerns removal implicates. *Md. Stadium Auth. v. Ellerbe Becket, Inc.*, 407

-28-

F.3d 255, 260 (4th Cir. 2005). Section 1442 removal, however, is construed "with sufficient breadth to effectuate its purpose." *Pantalone v. Aurora Pump Co.*, 576 F. Supp. 2d 325, 329 (D. Conn. 2008). Therefore, § 1442 should be construed broadly enough to provide a federal forum for federal officers and the litigation of federal defenses. *See State of N.C. v. Carr*, 386 F.2d 129, 131 (4th Cir. 1967). Doing so promotes the significant federal interest in protecting "federal officers from interference by hostile state courts." *Willingham v. Morgan*, 395 U.S. 402, 405 (1969).

A broad reading of § 1442 cannot save the defendants in this instance. Though it is unclear whether government contractors seeking removal under § 1442 benefit from the same broad statutory construction as federal officers, *see Hilbert v. McDonnell Douglas Corp.*, 529 F. Supp. 2d 187, 191 n.3 (D. Mass. 2008), it is very clear that a defendant may not manipulate removal statutes to strategically delay litigation. *See Lovern*, 121 F.3d at 163. The state court proceedings for the Parallel Litigations, including the imminent trials in the class actions, suggest that such a strategy was in play here. Moreover, § 1446's time requirement is specifically designed to protect against such undue delays and the consequent waste of judicial resources. *Link Telecomm., Inc. v. Sapperstein et al.*, 119 F. Supp. 2d 536, 541 (D. Md. 2000). In these circumstances, I cannot give § 1442 such a broad reading as to undermine the fundamental principles of fair and timely removal. Accordingly, I **FIND** that the *Bibb* Complaint provided the defendants with notice of grounds for § 1442 federal officer removal.

### D. Individual Litigations

In all but two of the Individual Litigations the amended complaints (collectively, "Amended Individual Complaints") are identical and closely resemble the *Bibb* Complaint. The complaints in the two Individual Litigations that did not file amended complaints are also very similar. For

simplicity, I will only discuss the contents of the Amended Individual Complaints, but I am satisfied that the same conclusion applies to all of the Individual Litigations.

Paragraphs 34 and 36 of the Individual Complaints repeat paragraphs 44 and 46 of the *Bibb* Complaint verbatim.[10] Notice of Removal, Ex. 1, *Tolley et al. v. Monstano Co. et al.*, No. 3:08-cv-1305 (S.D. W. Va. filed Nov. 21, 2008). Paragraphs 104 and 106 of the Amended Individual Complaints essentially repeat paragraphs 163 and 166 of the *Bibb* Complaint in all material respects. *Id.* In paragraph 87, the individual plaintiffs describe the sources of hazardous emissions. In addition to the disposal of dioxin through open "pit" burning and direct dumping into the Kanawha River, the plaintiffs allege that "the manufacturing process itself was dusty and [Monsanto's] dust control was haphazard." *Id.* This statement explicitly implicates the production of 2, 4, 5-T. For the reasons above, and for the reasons discussed with respect to the *Bibb* Complaint, I **FIND** that the complaints in the Individual Litigations provided the defendants with notice of grounds for § 1442 federal officer removal.

### E. *Bibb* and the Individual Litigations are Remanded, but *Carter* is Not Remanded

Because I find that the complaints in *Bibb* and the Individual Litigations provided the defendants with notice of grounds for federal officer removal under 28 § 1442, and because that notice was received more than thirty days before the defendants filed their notices of removal, I **FIND** that the notices of removal in those cases were untimely. Accordingly, *Bibb* and the Individual Litigations are **REMANDED** to the Circuit Court of Putnam County, West Virginia.

---

[10]     Paragraph 36 of the Amended Individual Complaints contains additional language addressing harm caused by burned waste.

*Carter* presents a more difficult matter. Because the *Carter* Complaint did not provide the defendants with notice of grounds for removal, I must determine whether the defendants received an other "paper" providing such notice. All of the papers submitted by the Plaintiffs as providing notice of grounds for federal officer removal were papers produced in connection with the *Bibb* litigation.[11] The interconnectedness of the Parallel Litigations is obvious, and I can imagine that the litigations resulted in overlapping discovery, and that the parties often discussed these cases in tandem. But neither party has presented any authority stating that a "paper" received in one litigation can serve notice of grounds for removal in a separate litigation. I am especially reluctant to recognize such cross-litigation notice because the claims alleged in the *Carter* Complaint were distinct from the claims in the other Parallel Litigations. Therefore, I will not consider papers filed in *Bibb* as papers that could provide notice of removal and trigger the thirty-day time period in *Carter* unless I find that the parties acknowledged an interrelationship of the two cases that would allow such notice.

The earliest record submitted by the parties in which the Plaintiffs acknowledged an overlap between the *Carter* and *Bibb* litigations is the Plaintiffs' Rule 16 Pretrial Submission, filed in the

---

[11]     These include the Plaintiffs' Requests for Admissions to Defendant Monsanto Company (Mot. Remand, Ex. 1), Deposition of Robert J. Pape (Pls.' Reply Mot. Remand, Ex. A [Docket 22]), Deposition of Herschell Everett Winter (Pls. Reply Mot. Remand, Ex. B), and Deposition of Curtis Winter (Pls.' Reply Mot. Remand, Ex. C). The Plaintiffs also submitted the Report of Mr. Ray K. Forrester, who was an expert for the defendants. (Mot. Remand, Ex. B.) It is unclear whether Mr. Forrester's report was submitted in connection with *Bibb*, *Carter*, or several of the Parallel Litigations. In any case, for the purposes of § 1446, an "'amended pleading, motion, order to [sic] other paper' must emanate from either the voluntary act of the plaintiff in the state court, or other acts or events not the product of the removing defendant's activity." *Potter v. Carvel Stores of N.Y., Inc.*, 203 F. Supp. 462, 467 (D. Md. 1962) (quoting 28 U.S.C. § 1446(b)), *aff'd*, 314 F.2d 45 (4th Cir. 1963). Because the new "paper" providing notice of grounds for removal must stem from the Plaintiffs' initiative, the report of the defendants' expert does not trigger the thirty-day removal period under § 1446, and I will not discuss that document further.

Circuit Court of Putnam County on November 3, 2008, as part of the proceedings in *Bibb*. (Notice Removal, Ex. 2) In that document, Plaintiffs' counsel explains his intention to move for dismissal of *Carter* because "the *Carter* class members are also members of the *Bibb* class [and t]he relief sought for members of the *Carter* class, with the exception of perhaps the riparian rights claim, is [sic] same relief sought in the *Bibb* action." (*Id.* at 1.) At that point, the defendants may have been on notice that any claims in the *Bibb* litigation would also be relevant to the *Carter* litigation, including the production-based claims. This notification, however, occurred less than thirty days before the defendants removed the case. Based on this record, I **FIND** that the defendants first received a paper from which they could ascertain the removability of *Carter* on November 3, 2008. Accordingly, I **FIND** that the defendants' removal of *Carter* was timely. The plaintiffs' Motion to Remand *Carter* is **DENIED**.

**IV. Plaintiffs' Motion to Stay Transfer**

The plaintiffs have conceded that their Motion to Stay Transfer has been superseded by their Response to the defendant's Letter-Form Motion dated November 21, 2008. (Pls.' Reply Mot. Stay Transfer 1.) Because of that concession, and because this court does not have authority to prevent the transfer of these cases to MDL No. 381, the motion is **DENIED as moot**.

**V. Defendants' Removal Does Not Warrant The Imposition Of Fees And Costs**

The Plaintiffs assert that the defendants' claim of timely removal is frivolous and therefore an award of attorney fees and costs upon remand is warranted. (Mot. Remand 7.) Given the volume and complexity of these cases, and having found that *Carter* was timely removed, I cannot find that the defendant "lacked an objective, reasonable basis for their removal." *Martin v. Franklin Capital*

*Corp.*, 546 U.S. 132, 141 (2005). The Plaintiffs' motion to recover costs and attorneys fees is **DENIED**.

**V. Conclusion**

For the reasons set forth above, the defendants' Letter-Form Motion to Stay is **DENIED** [Docket 6], the Plaintiffs' Motion to Stay Transfer of this Case and Other "Parallel Litigations" Pending the Court's Consideration of Plaintiff's Motion to Remand is **DENIED as moot** [Docket 7], and the Plaintiffs' Motion to Remand Due to Untimely Removal and to Recover Costs and Attorneys Fees is **GRANTED in part** and **DENIED in part** [Docket 9]. The Motion to Remand is **GRANTED** to the extent that the *Bibb* litigation and the Individual Litigations are **REMANDED**. It is **DENIED** to the extent that the *Carter* litigation is not remanded and that costs and attorneys' fees are not awarded.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party. The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER:     December 19, 2008

Joseph R. Goodwin, Chief Judge

-33-

## IN THE CIRCUIT COURT OF PUTNAM COUNTY, WEST VIRGINIA

MARY WARD,

        Plaintiff,

v.

MONSANTO COMPANY,
PHARMACIA CORPORATION,
AKZO NOBEL CHEMICALS INC.,
AKZO CHEMICALS, INC.,
FLEXSYS AMERICA CO.,
FLEXSYS AMERICA L.P.,
FLEXSYS INTERNATIONAL, L.P.,
FLEXSYS INTERNATIONAL CO.,
APOGEE COAL COMPANY, LLC,

        Defendants,

Civil Action No. 07-C-413
Judge Eagloski

### AMENDED COMPLAINT

1.    The Plaintiff, Mary Ward, by and through her counsel, Stuart Calwell and The Calwell Practice, PLLC for her amended complaint alleges and states as follows:

2.    The Plaintiff claims that her cancer was caused by exposure to dioxins/furans contamination of the air and property in Nitro, West Virginia, and in the surrounding towns and communities; Plaintiff alleges the same series of occurrences involving the negligent and otherwise unlawful release of dioxin from properties located in and about Nitro, West Virginia owned and/or controlled by the Defendants caused or significantly contributed to her cancer.

3.    Plaintiff is a resident and/or former resident of one or more of several communities surrounding a now defunct chemical plant located near Nitro, West Virginia, as will be more particularly shown below.

<div style="border:1px solid black; display:inline-block; text-align:center;">

**EXHIBIT**

**18**

</div>

1

4.     The former Monsanto Company (hereafter Old Monsanto) owned and operated the plant from approximately 1934 to approximately 2000. Beginning in 1949 and continuing through 1971 Old Monsanto produced at the plant site an agricultural herbicide 2,4,5 – trichlorophenoxyacidic acid (hereafter 2,4,5-T) which was heavily contaminated with dibenzo dioxins and dibenzo furans including 2,3,7,8 tetrachlorodibenzoparadioxin (hereafter collectively dioxins/furans). Beginning in 1949 and thereafter at all relevant times the Defendants caused dioxins/furans to escape to the atmosphere contaminating the air in and around the areas where the Plaintiff lived.

5.     Plaintiff brings this action against the defendants and each of them  for directly causing  Plaintiff's cancer by  causing air and  property to become contaminated with the dioxins/furans produced at the Old Monsanto plant in Nitro, West Virginia, and Plaintiff further brings this action against the above named defendants and each of them as successors to the dioxins/furans related legacy liabilities of the Old Monsanto Company's Agricultural Division for causing Plaintiff's cancer and/or for causing the air and property to become contaminated with the aforesaid dioxins/furans.

6.     As a result of the aforesaid dioxins/furans contamination, the Plaintiff was caused to breath dioxins/furans contaminated air, touch dioxins/furans contaminated soil, live in dioxins/furans contaminated houses, and ingest dioxins/furans during the entire time Plaintiff lived in the dioxins/furans contaminated areas.

7.     As a direct and proximate result of the aforesaid exposures Plaintiff contracted one or more cancers known to be caused and/ or promoted by exposure to dioxins/furans.

## JURISDICTION

8.      The Circuit Court of Putnam County has jurisdiction to decide this lawsuit.   The complained of events originated with the defendants' plant site, the aforesaid "Monsanto Plant", near Nitro, Putnam County, West Virginia.

9.      Plaintiff resides in the area of contamination in Putnam County/ Kanawha County, West Virginia

10.     The Plaintiff resides in Kanawha County, West Virginia, and has been directly injured and damaged as a direct consequence of the aforesaid dioxins/furans leaving the Nitro Plant, crossing the Putnam County/Kanawha County line and entering the Plaintiff's home and property.

## IDENTITY OF THE PARTIES

11.     Plaintiff, Mary Ward, a citizen and resident of the State of West Virginia and was diagnosed with cancer.

## DEFENDANTS

12.     The defendant, Monsanto Company, is a corporation, with its principal place of business in the State of Missouri.

13.     The defendant, Pharmacia Corporation, is a corporation, with its principal place of business in the State of New York.

14.     The defendant, Akzo Nobel Chemicals, Inc. is a corporation, with its principal place of business in the State of Illinois.

15.     The defendant, Akzo Chemicals, Inc. is a corporation, with its principal place of business in the State of Illinois.

3

16.     The defendant, Flexsys America Co., is a corporation, with its principal place of business in the State of Ohio.

17.     The defendant, Flexsys America, L.P. is a corporation, with its principal place of business in the State of Ohio.

18.     The defendant, Flexsys International L.P., is a corporation, with its principal place of business in the State of Ohio;

19.     The defendant, Flexsys International Co, is a corporation, with its principal place of business in the State of Ohio;

20.     The defendant Apogee Coal Company, LLC (the "coal company defendant") is a West Virginia corporation with its principal place of business in the State of West Virginia.

21.     At all relevant times the defendants were doing business in Putnam County and Kanawha County, West Virginia.

### THE LEGACY OF "OLD MONSANTO".

22.     Because the Defendant, Monsanto, is a "new" company, and because certain defendants, including "New Monsanto" are liable for the unlawful conduct of "Old Monsanto" a brief recitation of the history of these two relatives is necessary.

23.     Old Monsanto was created soon after the turn of the last century and operated continuously either as the Monsanto Chemical Company or simply as the Monsanto Company, until its pupation into one or more of the herein named defendants sometime during and after approximately 1997.

24.     Prior to September 1, 1997, Old Monsanto's organization included three divisions:   the   Agricultural   Products   Division   (or   some   similar   name),   the

Pharmaceuticals and Nutrition Division (or some similar name) and the Chemical Products Division (or some similar name).

25.    Old Monsanto acquired its Nitro plant from Rubber Services Industries sometime in the late 1920's or early 1930's with the intention of supplying rubber chemicals to the tire industry in Akron, Ohio, and elsewhere.

26.    Old Monsanto's Nitro plant was primarily a Chemical Products Division plant.   But the Nitro plant was also home to one of Old Monsanto's Agricultural Division's products.   More particularly, Old Monsanto's Agricultural Division produced, as aforesaid, a phenoxy herbicide at its Nitro plant known as 2,4,5-T from 1949 through 1971.

27.    The workers who manufactured this herbicide referred to it simply as "weed bug".   All "weed bug" manufactured by Old Monsanto was heavily contaminated with the aforesaid dioxins/furans.

## OLD MONSANTO'S KNOWLEDGE REGARDING DIOXIN.

28.    In the late 1940's Old Monsanto's Nitro plant was housed in buildings and sheds constructed by the United States Government in 1917-1918 as part of a nitro-cellulose (gunpowder) plant to produce munitions for World War I.

29    Plant structures were nothing more than a series of open-ended sheds and brick parapet walls scabbed together to provide a  roof over the giant cooking pots and other paraphernalia used in the production of basic chemical products.

30.    In approximately 1947, Old Monsanto's Agricultural Division began to produce on an experimental scale a molecule, that in its logically pure form was known as 2,4,5,-trichlorophenoxyacidic acid, or the aforesaid 2,4,5,-T.  This molecule exhibited

toxicity to plants by causing their root systems to out grow their leaf systems, thus causing the plant to destroy itself through a process of defoliation.

31    In 1949, Old Monsanto's Agricultural Division "started up" its 2,4,5-T manufacturing process at the Nitro plant. At that time and continuing through the early sixties Old Monsanto produced 2,4,5,-T in a "batch" process at the Nitro plant. This simply meant that batches of the product were cooked (reacted) as opposed to a continuous production stream. Large pots (autoclaves) were loaded with precursor chemicals, which were allowed to react (cook) to form the 2,4,5,-T molecule.

32.    In 1949, a reaction in one of the 2,4,5-T autoclaves went out of control. Heat and pressure built and a safety disk blew open, discharging the contents of the vessel to the atmosphere through the roof of building 34. A large cloud drifted over the plant and over the town. 226 plant workers became ill. Some were sent to the University of Cincinnati's Kettering Institute to be examined by Dr. Raymond Suskind. In three confidential reports to Old Monsanto dated 1949, 1952 and 1953 (copies of the 1949 and 1953 reports are attached as exhibits B and C), it was reported that the "unknown products of decomposition" liberated from the 2,4,5,-T autoclave caused a systemic intoxication in the workers involving most major organ systems, the endocrine system, the nervous system (both central and peripheral) and further resulted in a systemic acne dubbed "chloracne". The affected workers at the plant referred to the acne simply as "weed bumps".

33.    In 1957, two German scientists, Kimmig and Schultz, published the findings of research into the "unknown toxic by-products" of chlorinated benzene processes. They identified the toxin as dioxin, a molecule another German had patented

in the 1890's.  The technology of gas chromatography permitted the identification of the dioxin molecule and it was determined that it was this toxin that was the culprit in Old Monsanto's Nitro 1949 release.

34.     From 1949 until 1971, Old Monsanto's Agricultural Division produced 2,4,5-T on a continuous basis in its trichlorophenol plant in Nitro.   Each and every ounce and each and every molecule of this product had associated with it the contaminants, the aforesaid dioxins/furans.

35.     In approximately 1964, Old Monsanto began selling 2,4,5,-T to the Armed Services to be used as a part of the herbicide "Agent Orange" for use in Viet Nam. Production of 2,4,5-T continued in a new building.  Dioxin/furan content of the product, however, remained unchanged and often increased.  Throughout this period Old Monsanto's Agricultural Division, with the advice of Old Monsanto's Medical Director, Emmet Kelly, MD, continued to experience adverse health effects in its workers engaged in the production of 2,4,5-T.

36.     The production of dioxin contaminated 2,4,5-T continued 7 days a week 365 days a year from 1949 to approximately 1971 at the Monsanto Nitro plant.  During this entire time period, dioxin contaminated dust and particulate matter was released to the atmosphere by Old Monsanto's Agricultural Division where it was carried by the prevailing winds over the town of Nitro, surrounding communities and the Plaintiff's home and business; during this entire time dioxin contaminated wastes were burned, 7 days a week, in an open 20 feet by 40 feet pit on the plant site as well as in off-site dumps – including at least one dump site owned and or controlled by the coal company defendant -- causing dioxin contaminated particulate matter to contaminate the air and

property in Nitro and surrounding area. During the period 1949 to 1970 approximately 3,000 pounds of 2,3,7,8 TCDD was released to the environment.

37.     In approximately 1972, Old Monsanto dismantled the 2,4,5-T building and buried it, due to its dioxins/furans contamination, on the plant site.

38.     At all times relevant, Old Monsanto and the herein named defendants had actual knowledge of the dioxins/furans contamination problem at Nitro and the surrounding communities and in the alternative certain of the defendants knew or with the exercise of reasonable care should have known of the aforesaid contamination.

### SOLUTIA, INC.

39.     Solutia, Inc. (hereafter "Solutia"), was incorporated in April 1997  by Old Monsanto corporate insiders.    Solutia is simply the renamed Queeny Chemical Company[1], a subsidiary of Old Monsanto.

40.     On or about September 1, 1997, Old Monsanto entered into a Distribution Agreement with Solutia, which transferred the operations, assets and liabilities of Old Monsanto's Chemicals Division to Solutia.

41.     In connection with the aforesaid distribution to Solutia, Old Monsanto distributed on a one to five basis all of the stock of Solutia to Old Monsanto shareholders (the "spinoff").

42.     Solutia was created by Old Monsanto insiders as the vessel into which Old Monsanto and the named defendants sought to concentrate their liabilities arising from the environmentally ruinous historical conduct of Old Monsanto at its various Chemicals Division operations throughout the United States, including Nitro, West Virginia.

---

[1] The Queeny Plant and Old Monsanto had their beginnings simultaneously in 1901. John Francis Queeny and Dr. Louis Veillon launched these enterprises simultaneously, naming Monsanto after John Queeny's wife Olga Monsanto Queeny.

43.     On information and belief, Solutia agreed to assume Old Monsanto's Chemicals Division legacy liability because at the time Solutia was being controlled by former Old Monsanto corporate insiders.

44.     Old Monsanto did not, however, transfer all operations, assets and liabilities to Solutia.   The so-called agriculture business was not transferred.   The pharmaceutical and nutrition businesses were, likewise, retained by Old Monsanto.

45.     As aforesaid, the Nitro plant was part of the chemicals division and was distributed to Solutia.   However, the Nitro plant was host to one of Monsanto's Agricultural Division operations involving the manufacture of the agricultural herbicide, 2,4,5,-T.   As such, the liabilities arising from the Nitro 2,4,5-T production unit did not transfer to Solutia.   Further, pursuant to a "Master Operating Agreement" dated as of January 1, 1995, pertinent parts of which were adopted by Solutia, Solutia never operated the Nitro plant, rather one of the named defendants, Flexsys, as appears below, took control of and operated the plant.

46.     Upon information and belief, following a brief six year "effort" by Solutia to operate plants in 18 areas of the United States, Solutia and 14 of its corporate affiliates filed petitions for relief under chapter 11 of title 11, United States Code (the Bankruptcy Code) in the United States Bankruptcy Court for the Southern District of New York. Solutia continues to operate and manage its property as Debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

## DEFENDANTS: MONSANTO COMPANY

47.     The defendant Monsanto Company (hereinafter New Monsanto),   is the successor in interest to the liabilities of Old Monsanto.

48.     New Monsanto was incorporated in February 2000 as a subsidiary of the defendant, Pharmacia Corporation ("Pharmacia"), under the name Monsanto Ag Company.

49.     On March 31, 2000, New Monsanto changed its name from "Monsanto Ag Company" to "Monsanto Company".

50.     On September 1, 2000, Pharmacia transferred the assets and liabilities of its agricultural business to New Monsanto pursuant to the terms of a Separation Agreement.

51.     On October 23, 2000, New Monsanto sold 38,033,000 shares of its common stock in an initial public offering at a price of $20 per share.   Pharmacia continued to own the remaining shares, representing 85.2% of the outstanding shares.

52.     On August 13, 2002, Pharmacia spun off its remaining interest in New Monsanto by distributing its entire ownership of New Monsanto stock to Pharmacia shareholders by means of a tax-free dividend. The stated reasons for the separation of the agricultural business from the other businesses of Pharmacia were that as a separate company, the agricultural business could have a more focused investor base, greater strategic focus and the ability to offer better incentives to employees.

53.     Under the terms of the Separation Agreement, New Monsanto agreed to indemnify Pharmacia for any liability it might have for environmental remediation or

other environmental responsibilities primarily related to Pharmacia's former agricultural or chemical businesses.

54.     The aforesaid Separation Agreement provided that New Monsanto would indemnify Pharmacia for environmental liabilities that Solutia, the former chemicals business of Pharmacia, assumed pursuant to the aforesaid Distribution Agreement, to the extent that Solutia failed to pay, perform or discharge those liabilities.

55.     On July 1, 2002, in anticipation of the spinoff of New Monsanto, Phamacia and New Monsanto entered into a First Amendment to the Separation Agreement ("Amendment"). In the amendment, the definition of "Former Agricultural Business" was amended by adding the following language at the end of Schedule F-1 under the heading "Other Former Businesses": "**34. discontinued herbicides, including, without limitation, 2,4-D (2,4 dichlorophenoxyacetic acid) and 2,4,5-T (2,4,5 trichlorophenoxyacetic acid)**" (emphasis added). This amendment made it clear that the New Monsanto was keeping its agricultural liabilities. The New Monsanto emerged from the tangle of business deals instigated by Old Monsanto, with Old Monsanto's valuable agricultural assets intact, and ostensibly protected from Old Monsanto's Chemicals Division legacy liability.

56.     New Monsanto maintains its principal offices in St. Louis, MO, the same corporate park occupied for decades by the Old Monsanto. New Monsanto rarely refers to its former self by the name "Monsanto", choosing instead to refer to legacy issues in the name of the defendant Pharmacia, a company that did not exist prior to March 31, 2000.

## PHARMACIA CORPORATION

57.     Pharmacia Corporation ("Pharmacia") was originally incorporated under the name Monsanto Company (the successor to a Missouri corporation, Monsanto Chemical Works).

58.     On March 31, 2000, MP Sub, Incorporated, a wholly-owned subsidiary of Pharmacia (then named Monsanto Company), merged with and into Pharmacia & Upjohn, Inc. ("P&U") pursuant to the terms of an Agreement and Plan of Merger dated as of December 19, 1999, among the parties (the "Merger Agreement").

59.     As a result of the merger, each share of common stock of P&U was converted into 1.19 shares of the common stock of Pharmacia, and each share of Series A Convertible Perpetual Preferred Stock of P&U was converted into one share of a new series of convertible preferred stock of Pharmacia designated as Series B Convertible Preferred Stock.

60.     As a part of the aforesaid merger, Old Monsanto was renamed Pharmacia Corporation and P&U became a subsidiary of Pharmacia.

61.     After the merger, the agricultural operations of Pharmacia were transferred to New Monsanto.

62.     On July 13, 2002, Pfizer Inc. ("Pfizer") entered into an Agreement and Plan of Merger (the "Merger Agreement") with Pharmacia and Pilsner Acquisition Sub Corp., a direct wholly-owned subsidiary of Pfizer (the "Merger Sub").

63.     The aforesaid merger was completed on July 16, 2003, at which time the Merger Sub was merged with and into Pharmacia, and Pharmacia survived the merger as a wholly-owned subsidiary of Pfizer.

64.     Each Pharmacia shareholder received 1.4 shares of Pfizer stock for each share of Pharmacia stock, and each share of Pharmacia's Series C convertible perpetual preferred stock was exchanged for one share of Pfizer Series A convertible perpetual preferred stock.

65.     The total estimated purchase price paid by Pfizer was $56 billion.

66.     A condition precedent to Pfizer paying the purchase price was that Pharmacia had to cause one of the following to occur:

       (i)      a spin-off of New Monsanto,

       (ii)     the sale of all or substantially all of the assets of New Monsanto followed by the liquidation and dissolution of New Monsanto, or

       (iii)   the sale of all of Pharmacia's equity interest in Monsanto.

67.     Pharmacia has offices in St. Louis, Missouri.

68.     At all relevant times, Pharmacia and its subsidiaries, owned, occupied, and otherwise controlled the aforesaid contaminated Nitro plant.

69.     Further at all relevant times, Pharmacia was and is a successor to the liabilities of Old Monsanto and Pharmacia has and continues to aid and abet Monsanto in the contamination of the communities surrounding the Nitro plant.

### AKZO NOBEL CHEMICALS, INC., AKZO CHEMICALS, INC.

70.  The defendants, Akzo Nobel Chemicals, Inc., and Akzo Chemicals, Inc. are corporations, and each of these defendants maintains its principal place of business in the State of Illinois (hereafter, collectively, "Akzo").

71.     The defendants, "Akzo", collectively, are headquartered in the Netherlands. "Akzo", collectively, are active in three business areas: pharma, coatings and chemicals.

72.     Through a series of complex corporate permutations, Akzo Nobel, NV created the defendants, Akzo, as U.S. subsidiaries for the purpose of carrying out certain business plans with the defendants, as more particularly appears below.

73.     The defendants, Akzo, were at all relevant times licensed to do business in West Virginia and at all relevant times were doing business in West Virginia, including doing business at the aforesaid Nitro plant site.

### FLEXSYS AMERICA CO., FLEXSYS AMERICA, L.P., FLEXSYS INTERNATIONAL, L.P., AND FLEXSYS INTERNATIONAL, CO.

74.     The defendants, Flexsys America Co, Flexsys America, L.P., Flexsys International, L.P. and Flexsys International, Co., are corporations (collectively "Flexsys").

75.     Each of these defendants maintains its principal place of business in the State of Ohio and at all times relevant each of the defendants, Flexsys, were licensed to do business in the State of West Virginia and were doing business in the State of West Virginia.

76.     The defendants, Flexsys, are and were created by  Flexsys NV, an incorporated joint venture existing under and by virtue of the laws of Belgium, formed in 1995 between the aforesaid Akzo Nobel NV and Old Monsanto, and maintaining a principal place of business in Woluwe, Belgium.

14

77.   The defendants, Flexsys, were formed for the purpose of carrying out various complex business ventures with the other defendants as more particularly appears below.

78.   At relevant times, the defendants, Flexsys, were in joint ventures with Old Monsanto and at relevant times were in joint ventures with the other defendants, including Pharmacia and New Monsanto, for the purpose, but not limited thereto, of operating and controlling the Old Monsanto Nitro plant near Nitro, West Virginia.

79.   To carry out the aforesaid joint venture, Akzo and Old Monsanto entered into a "Master Operating Agreement" and certain amendments thereto as of January 1, 1995. Under this agreement, Old Monsanto, Akzo, or Flexsys was the "operator" or the "guest" at certain operating sites, including Nitro. At sites at which one party was an "operator" the reciprocal party was a "guest", and vice versa. The Master Operating Agreement provided that Flexsys was to be the operator of the Nitro plant providing services to Solutia, as guest, at Nitro.

80.   At various and relevant times Flexsys owned, operated or had control of the Nitro, West Virginia, plant site. During these times the defendants, Flexsys and Akzo knew and had reason to know of the aforesaid dangerous dioxin contamination existing at the Nitro plant site and further knew or had reason to know that dioxin contamination was leaving the plant site causing the communities in the surrounding area to become contaminated with dioxin and other related toxins.

81.   At all relevant times the defendants Akzo and Flexsys had control of, operated, and otherwise had responsibility for Old Monsanto's Nitro Plant. At all such times, these defendants knew, should have known, and were in a position to know of the

15

risks of contamination and off site contamination presented by the dioxin/furan contaminated environment of the Nitro Plant site. Because of this relationship, the Akzo defendants and the Flexsys defendants are successors to the liability of Old Monsanto for off site dioxin/furan contamination with reference to the Nitro site and these defendants are jointly and severely liable with the other defendants.

82.    At all times relevant, the defendants were doing business in the State of West Virginia, at, by and through their chemical plant located on Plant Road, Nitro, West Virginia.

## APPOGEE COAL COMPANY, LLC

83.    Defendant Apogee Coal Company, LLC is a West Virginia corporation, with its principle place of business is in Charleston, West Virginia, and upon information and belief, is a successor to the liabilities to companies that owned and/or controlled a Manila Creek dump site at relevant times herein where dioxin contaminated wastes from the said Nitro plant were disposed of and burned all with the permission and knowledge of Apogee.

84.    At all relevant times, the defendants each had ownership, possession control and/or the right to control of the dump sites identified herein.

## ALLEGATIONS OF FACT AND CAUSES OF ACTION

85.    Plaintiff incorporates each and every allegation above, and specifically directs the reader to the section "The Legacy of Old Monsanto".

86.    The town of Nitro was built, as were the Nitro plant buildings, during 1917-1918. Bungalows, store buildings, schools and other buildings were constructed all as a part of a government reservation to house munitions plant employees and their families. When the government moved out and the chemical plants moved in the town

became populated with chemical plant workers and their families. Many of the original World War I buildings and houses still exist and are still occupied. Additionally, over the years new houses were built and the population of the river bottom towns of Nitro, Poca, Bancroft and Saint Albans grew as did unincorporated communities around the towns.

87.     During the years that Old Monsanto was operating its trichlorophenol plant, it adopted an unlawful practice of disposing of dioxin waste materials by a continuous process of open "pit" burning.  This practice was largely denied by Old Monsanto whose representatives characterized the practice as an "incineration process" when asked by regulatory authorities. Further, the manufacturing process itself was dusty and Old Monsanto's dust control was haphazard. Additionally, dioxin laden liquid wastes were sewered directly to the Kanawha River during the entire relevant time period and continues today.

88.     In 1983, the United States Environmental Protection Agency tested Old Monsanto's plant site for the presence of dioxin.  Certain off site sampling were performed as well.  Most of the samples obtained from the sampling grid were positive for dioxin, both on the plant site and at off site locations.

89.     Plaintiff's independent sampling of houses in the contaminated area, reveals levels of 2,3,7,8 TCDD in attic dust that exceed 2200 parts per trillion.  EPA clean-up standards for 2,3,7,8 TCDD contaminated dirt require a level less than 4 parts per trillion.  Further, as aforesaid, Plaintiff's biological testing of certain residents of the contaminated area reveals serum lipid levels of 2,3,7,8 TCDD well above the level of detection and therefore well above levels of dioxins/furans in the general population.

90.     The empirical data, to a reasonable probability, support the conclusion that Nitro town and the surrounding communities are contaminated with dioxin generated by the Old Monsanto plant trichlorophenol process during the period 1949 through 1971.

91.     Old Monsanto and its successors in the years following the cessation of 2,4,5-T production (1970 to the present) failed to adequately control the dioxin contaminated soils and other dioxin contaminated waste materials both on and off the plant site. Dioxins/furans continued to be re-deposited and re-distributed from the plant site and the off site dumps so as to continue the process of air and property contamination.

92.     The Old Monsanto plant site remains contaminated today and continues to present the risk of off site migration of dioxin contaminated dust as well as dioxin contaminated surface water runoff.

93.     The non-Monsanto Defendants knew or should have known of the dioxin contamination at the Nitro plant site. These Defendants, jointly, severally, and in concert failed to take affirmative steps to stop the continued escape of dioxins/furans from the aforesaid sites. Indeed, these Defendants acted carelessly, negligently, recklessly, and/or deliberately in ways to increase the escape of dioxin to the Nitro area as afore described.

## NEGLIGENCE

94.     Plaintiff incorporates each of the foregoing paragraphs.

95.     Each of the Defendants at all relevant times owed a duty to the Plaintiff, to act with due care in the handling and maintenance of the highly toxic dioxins/furans to prevent their escape from the aforesaid sites and contaminating the air and property of Nitro and the surrounding area.

96.     Each of the Defendants at all relevant times knew or in the exercise of reasonable diligence should have known of the highly toxic properties of dioxin and that dioxin was and is a known promoter of cancer and that dioxin was and is a known human carcinogen.

97.     At all times relevant the Defendants, and each of them, knew that the area around the Monsanto plant was populated with permanent residents who would likely live out their lives in the area contaminated by the Defendants' dioxin.

98.     At all times relevant, the Defendants, and each of them, knew that dioxins/furans are slow acting poisons with long latency periods so that detection and causation become difficult and expensive to prove. The Defendants, acting on that knowledge, deliberately allowed the aforesaid area to become dangerously contaminated. The defendants were and are gambling that the passage of time will shield the Defendants and each of them from accountability for their dreadful acts, allowing the Defendants to blame the vagaries of life for the cancer Plaintiff suffers.

99.     At all times relevant, the Defendants, and each of them, as aforesaid, caused the creation of dioxins/furans on the Nitro plant site, caused dioxins/furans to escape the Nitro plant site and the aforesaid off site dumps, in a negligent, careless, reckless and/or deliberate manner and in so doing breached the duties aforesaid owed to the Plaintiff..

100.    As a direct and proximate result of the conduct of the Defendants as aforesaid, but not limited thereto, the Plaintiff has been injured and caused to suffer cancer and as a consequence have been damaged in ways and in amounts hereinafter set forth.

## *RYLANDS V. FLETCHER* – STRICT LIABILITY

101.   Plaintiff incorporates by reference each and every allegation and paragraph in the foregoing and adopts them as though fully set forth herein in the first instance.

102.   The defendants' operations at the Nitro Plant site were abnormally dangerous within the meaning of *Peneschi v. National Steel Corp, 295 S.E.2d 1 (W.Va. 1982)*, which adopted the *Restatement (Second) of Torts 519 and 520 (1976)*[2] definition of "abnormally dangerous", later confirmed in *Bowers v. Wurzburg, 528 S.E.2d 475 (W.Va. 1999)*.

103.   Dioxins/furans are abnormally dangerous.

104.   The production of dioxins/ furans is an abnormally dangerous activity.

105.   Maintaining property contaminated with dioxins/furans is an abnormally dangerous activity; further, open burning of dioxin contaminated waste is an abnormally dangerous activity.

106.   The Defendants in choosing to use, produce, maintain and otherwise create dioxins at the Nitro Plant site chose to create an abnormally dangerous

---

[2] 519. GENERAL PRINCIPLE
(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.
(2) this strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.
520. ABNORMALLY DANGEROUS ACTIVITIES
In determining whether an activity is abnormally dangerous, the following factors are to be considered:
    (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
    (b) likelihood that the harm that results from it will be great;
    (c) inability to eliminate the risk by the exercise of reasonable care;
    (d) extent to which the activity is not a matter of common usage;
    (e) inappropriateness of the activity to the place where it is carried on; and
    (f) extent to which its value to the community is outweighed by its dangerous attributes.

instrumentality (dioxin) and are strictly liable without a showing of negligence for any injury proximately caused the Plaintiff by that instrumentality (dioxins/furans).

107.    As a direct and proximate result of the Defendants activities as aforesaid, but not limited thereto, poisonous and toxic dust and particulate matter has invaded the property and person of  the Plaintiff and Plaintiff has, therefore been damaged and injured in her person and property as set forth above and more particularly stated below.

WHEREFORE the Plaintiff demands judgment of and from the Defendants and each of them in an amount hereinafter prayed for.

### PRAYER FOR RELIEF AND COMPENSATORY DAMAGES

108.    Plaintiff demands judgment of and from the Defendants and each of them in an amount to fairly compensate her for past, present and future medical bills; lost wages; past, present, and future pain and suffering, mental anguish, and loss of enjoyment of life.

WHEREFORE, Plaintiff demands judgment of and from the Defendants and each of them in an amount to fairly compensate her for compensatory damages.

### PUNITIVE DAMAGES

109.    Defendants' actions, or some of them, were undertaken in a willful, wanton, and reckless manner evidencing a callous disregard for the health and wellbeing of the residents of the Nitro area.

110.    Plaintiff is entitled to punitive damages to punish and deter Defendants' conduct.

WHEREFORE, Plaintiff demands as and for punitive damages in an amount sufficient to deter defendants from future conduct as above set forth.

21

## JURY DEMAND

The Plaintiff herein demands a trial by jury.

**MARY WARD,**
**By Counsel**

Stuart Calwell (WV State Bar #595)
John Skaggs (WV State Bar#3432)
**THE CALWELL PRACTICE PLLC**
Law and Arts Center West
500 Randolph Street
Charleston, West Virginia 25301
(304) 343-4323

and

THE CALWELL PRACTICE PLLC
90 Broad Street, 19th Floor
New York, New York 10004
(212) 422-0068

22



RECEIVED AUG 0 4 2009

**Law and Arts Center West**
500 Randolph St.
Charleston, WV 25302

Post Office Box 113
Charleston, WV 25321

(304) 343-4323
(304) 344-3684 FAX
(800) 876-5529 Toll Free

www.calwellpractice.com

Lawyers Licensed in:

California
Florida
New Jersey
New York
Pennsylvania
Virginia
West Virginia

August 4, 2009

Ronnie Matthews, Clerk
Circuit Court of Putnam County
3389 Winfield Rd.
Winfield, WV 25213

Dear Mr. Matthews:

Enclosed for filing is the "**PLAINTIFF'S MOTION FOR ADOPTION OF CASE MANAGEMENT PLAN AND BIFURCATION OF ISSUES AT TRIAL**" All counsel of record have been served as evidenced by the enclosed Certificate of Service.

Thank you for your time and attention to this matter.

Very truly yours,

David H. Carriger    /mH

DHC/mah

Enclosure as stated

cc:    Counsel of Record
       The Honorable O.C. Spaulding
       The Honorable Phillip Stowers

**EXHIBIT**
**19**



## IN THE CIRCUIT COURT OF PUTNAM COUNTY, WEST VIRGINIA

| | | |
|---|---|---|
| **TERRY BRADSHAW,** | **07-C-339** | (Judge Phillip M. Stowers) |
| **TAMMY CHANCEY,** | **07-C-340** | (Judge O.C. Spaulding) |
| **DEVAE WILLIAMS,** | **07-C-345** | (Judge Phillip M. Stowers) |
| **JAMES RANDOLPH,** | **07-C-346** | (Judge Phillip M. Stowers) |
| **CURTIS BLACKSHIRE,** | **07-C-349** | (Judge Phillip M. Stowers) |
| **ELLEN MANN,** | **07-C-350** | (Judge Phillip M. Stowers) |
| **OLIN MCCLANAHAN,** | **07-C-351** | (Judge O.C. Spaulding) |
| **HERMAN BARTLETT,** | **07-C-352** | (Judge Phillip M. Stowers) |
| **CHRIS MORRIS,** | **07-C-354** | (Judge O.C. Spaulding) |
| **HARVEY BRIGHTWELL,** | **07-C-356** | (Judge O.C. Spaulding) |
| **SANDRA PARRI ,** | **07-C-357** | (Judge Phillip M. Stowers) |
| **ROBERT CREMERING ,** | **07-C-363** | (Judge O.C. Spaulding) |
| **KENNETH PHILLIPS,** | **07-C-364** | (Judge O.C. Spaulding) |
| **LLOYD BOGGESS,** | **07-C-367** | (Judge O.C. Spaulding) |
| **GORDON POTTORF,** | **07-C-368** | (Judge O.C. Spaulding) |
| **DENCIL HARRISON,** | **07-C-369** | (Judge Phillip M. Stowers) |
| **JAMES BONNETT,** | **07-C-370** | (Judge O.C. Spaulding) |
| **MAGGIE CONNER,** | **07-C-373** | (Judge Phillip M. Stowers) |
| **STEVEN GILLISPIE,** | **07-C-378** | (Judge Phillip M. Stowers) |
| **GARY FISHER,** | **07-C-382** | (Judge Phillip M. Stowers) |
| **RANDY SMITH,** | **07-C-385** | (Judge Phillip M. Stowers) |
| **STERLING SMITH,** | **07-C-386** | (Judge Phillip M. Stowers) |

| | | |
|---|---|---|
| **JANICE SCOTT,** | **07-C-387** | (Judge Phillip M. Stowers) |
| **JACK WOODALL,** | **07-C-388** | (Judge O.C. Spaulding) |
| **MARY HEDRICK,** | **07-C-392** | (Judge O.C. Spaulding) |
| **EVERETTE HEDRICK,** | **07-C-393** | (Judge O.C. Spaulding) |
| **DELBERT HAWLEY,** | **07-C-395** | (Judge O.C. Spaulding) |
| **GALE SUMMERS,** | **07-C-399** | (Judge O.C. Spaulding) |
| **JAMES TOTTEN, SR.,** | **07-C-403** | (Judge Phillip M. Stowers) |
| **LEONARD LETT,** | **07-C-404** | (Judge Phillip M. Stowers) |
| **WALTER LOVELESS,** | **07-C-405** | (Judge Phillip M. Stowers) |
| **LINDA TURLEY-FRANEZAK,** | **07-C-408** | (Judge O.C. Spaulding) |
| **LESLIE JACKSON,** | **07-C-409** | (Judge O.C. Spaulding) |
| **DONALD TYREE,** | **07-C-41 1** | (Judge Phillip M. Stowers) |
| **MARY WARD,** | **07-C-413** | (Judge Phillip M. Stowers) |
| **RUBEN JOHNSON,** | **07-C-414** | (Judge Phillip M. Stowers) |

## PLAINTIFF'S MOTION FOR ADOPTION OF CASE MANAGEMENT PLAN AND BIFURCATION OF ISSUES AT TRIAL

COMES NOW the Plaintiffs, by and through undersigned counsel, and hereby moves the Court to adopt a Case Management Plan and Trial Bifurcation in the above styled civil action.  In support of his motion, Plaintiff states as follows:

1.  Currently pending before the Court are approximately 45 cases alleging exposure to dioxin that caused cancer in each of the individual plaintiffs, who lived, worked, or went to school in the Nitro area.  Plaintiffs are prepared to file, within 30 days, approximately 160 additional cases arising out of similar

facts.   Like the pending cases, the 160 additional cases allege exposure to dioxin as a result of the Defendants' disposal of dioxin-contaminated waste from the Old Monsanto plant and the Defendants subsequent waste management practices.   Like the pending cases, the approximately 160 new Plaintiffs all allege they have developed cancer as a result of such exposure, and demand punitive damages from the Defendants.   This will bring the total number of similar cases pending before this Court to approximately 205.

2.      To date, there has never been a scheduling order entered in any of the 45 cases nor a Case Management Plan adopted to organize this litigation.   The only progress in these cases has been form interrogatories sent to plaintiff's counsel and defendant's depositions of various plaintiffs.

3.      In the recent case of *Caruso v. Pierce*, --S.E.2d, WL 1361937 (W.Va. 2009). The Court held in Syllabus Point 2:

> Rule 16(b) of the *West Virginia Rules of Civil Procedure [1998]*
>
> requires active judicial management of a case, and mandates that a trial court "shall...enter a scheduling order" establishing time frames for the joinder of parties, the amendment of pleadings, the completion of discovery, the filing of dispositive motions, and generally guiding the parties toward a prompt, fair and cost-effective resolution of the case.

4.      In *Caruso*, the West Virginia Supreme Court of Appeals also pointed out that "in the absence of a scheduling order entered by the circuit court, it is not beyond reason that a complex case such as this could easily be detoured from reaching a final resolution."   Thus, allowing one sided discovery without a trial and discovery plan presents the risk of protracted, expensive litigation without end, particularly in complex cases like these.

5.    Plaintiffs propose the following Case Management Plan with the issues to be

bifurcated at trial as follows:

a.   **Phase I**: Liability issues of negligence, strict liability, nuisance, and

trespass.   Also to be tried in Phase I will be entitlement to punitive

damages including a multiplier, and general causation.

b.   **Phase II**: Plaintiffs' issues of individual causation and compensatory

damages.

Plaintiffs propose that the parties will create reasonably sized trial groups

before Phase II of the bifurcated trial.

Additionally, all discovery, expert witness disclosures, etc., will proceed

on all issues in Phase I and Phase II pursuant to a scheduling order to be

agreed upon by the parties.

6.    Rule 42(c) of the West Virginia Rules of Civil Procedure states in

pertinent part:

> The court, in furtherance of convenience or to avoid
> prejudice, or when separate trials will be conducive to
> expedition and economy, may order a separate trial of any
> claims…

Rule 42(c) of the W.Va. R. Civ. P. gives the trial court the discretion to

bifurcate issues for trial.

7.    Additionally, there is ample case law to support the bifurcation of issues at

trial.   Plaintiffs rely on *Andrews v. Reynolds Meml. Hosp.*, in which the

Supreme Court of Appeals of West Virginia held:

> Granting separate trials rests, generally, within discretion of the trial court; however, trial court's authority in that regard is limited, and bifurcation should be granted only when clearly necessary.

201 W.Va. 624, 499 S.E. 2d 846.

Bifurcation of issues at trial is clearly necessary. With 45 cases currently pending before the Court and 160 cases soon to be filed, the amount of trial time necessary to accommodate 205 individual personal injury cases, without bifurcation, would consume this Court's docket for years to come, and would prejudice individual plaintiffs who have a right to a just and speedy determination of their case.

Furthermore, Plaintiffs look to *Barlow v. Hester Indus.*, in which the Supreme Court of Appeal of West Virginia held that the:

> Trial court has discretion to sever claims in furtherance of convenience or economy, or to prevent prejudice.

198 W.Va. 118, 479 S.E. 2d 628.

Plaintiffs contend that in the interest of judicial economy and convenience that bifurcation of these issues at trial into two phases serves to expedite the judicial process and is an important step to the ultimate resolution of these matters.

8.    In prior hearings this Court has expressed the need for some form of Case Management Plan.

9.    All 205 cases have the same common issues. **Phase I** of the proposed bifurcation is appropriate because there is a logical relationship between these civil actions. All are personal injury or wrongful death claims, in

which Plaintiffs allege exposure to dioxin as a result of the same conduct: the Defendants' disposal of dioxin-contaminated waste from the Old Monsanto plant and the Defendants subsequent waste management practices and the resulting airborne dispersal of dioxin throughout Nitro and the surrounding areas. Likewise, all of the individual Plaintiffs have cancer. Thus, there are common issues of liability, general causation, and punitive damages that can satisfactorily be decided in Phase I of the trial

10. **Phase II** of the proposed bifurcation is appropriate because each of the actions also involve unique facts pertaining to individual/specific medical causation, injury-in-fact, and damages.

WHEREFORE the Plaintiff prays that the Court adopt Plaintiffs proposed Motion to Adopt a Case Management Plan and Bifurcation of Issues at Trial.

Plaintiff, by Counsel

Stuart Calwell (WV Bar No. 0595)
David H. Carriger (WV Bar No 7140)
THE CALWELL PRACTICE PLLC
Law and Arts Center West
500 Randolph Street
Charleston, WV 25302
(304) 343-4323
*Counsel for Plaintiff*

## IN THE CIRCUIT COURT OF PUTNAM COUNTY, WEST VIRGINIA

| | | |
|---|---|---|
| TERRY BRADSHAW, | 07-C-339 | (Judge Phillip M. Stowers) |
| TAMMY CHANCEY, | 07-C-340 | (Judge O.C. Spaulding) |
| DEVAE WILLIAMS, | 07-C-345 | (Judge Phillip M. Stowers) |
| JAMES RANDOLPH, | 07-C-346 | (Judge Phillip M. Stowers) |
| CURTIS BLACKSHIRE, | 07-C-349 | (Judge Phillip M. Stowers) |
| ELLEN MANN, | 07-C-350 | (Judge Phillip M. Stowers) |
| OLIN MCCLANAHAN, | 07-C-351 | (Judge O.C. Spaulding) |
| HERMAN BARTLETT, | 07-C-352 | (Judge Phillip M. Stowers) |
| CHRIS MORRIS, | 07-C-354 | (Judge O.C. Spaulding) |
| HARVEY BRIGHTWELL, | 07-C-356 | (Judge O.C. Spaulding) |
| SANDRA PARRI , | 07-C-357 | (Judge Phillip M. Stowers) |
| ROBERT CREMERING , | 07-C-363 | (Judge O.C. Spaulding) |
| KENNETH PHILLIPS, | 07-C-364 | (Judge O.C. Spaulding) |
| LLOYD BOGGESS, | 07-C-367 | (Judge O.C. Spaulding) |
| GORDON POTTORF, | 07-C-368 | (Judge O.C. Spaulding) |
| DENCIL HARRISON, | 07-C-369 | (Judge Phillip M. Stowers) |
| JAMES BONNETT, | 07-C-370 | (Judge O.C. Spaulding) |
| MAGGIE CONNER, | 07-C-373 | (Judge Phillip M. Stowers) |
| STEVEN GILLISPIE, | 07-C-378 | (Judge Phillip M. Stowers) |
| GARY FISHER, | 07-C-382 | (Judge Phillip M. Stowers) |
| RANDY SMITH, | 07-C-385 | (Judge Phillip M. Stowers) |
| STERLING SMITH, | 07-C-386 | (Judge Phillip M. Stowers) |

| JANICE SCOTT, | 07-C-387 | (Judge Phillip M. Stowers) |
| JACK WOODALL, | 07-C-388 | (Judge O.C. Spaulding) |
| MARY HEDRICK, | 07-C-392 | (Judge O.C. Spaulding) |
| EVERETTE HEDRICK, | 07-C-393 | (Judge O.C. Spaulding) |
| DELBERT HAWLEY, | 07-C-395 | (Judge O.C. Spaulding) |
| GALE SUMMERS, | 07-C-399 | (Judge O.C. Spaulding) |
| JAMES TOTTEN, SR., | 07-C-403 | (Judge Phillip M. Stowers) |
| LEONARD LETT, | 07-C-404 | (Judge Phillip M. Stowers) |
| WALTER LOVELESS, | 07-C-405 | (Judge Phillip M. Stowers) |
| LINDA TURLEY-FRANEZAK, | 07-C-408 | (Judge O.C. Spaulding) |
| LESLIE JACKSON, | 07-C-409 | (Judge O.C. Spaulding) |
| DONALD TYREE, | 07-C-41 1 | (Judge Phillip M. Stowers) |
| MARY WARD, | 07-C-413 | (Judge Phillip M. Stowers) |
| RUBEN JOHNSON, | 07-C-414 | (Judge Phillip M. Stowers) |

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that he has served the foregoing **"PLAINTIFF'S MOTION FOR ADOPTION OF CASE MANAGEMENT PLAN AND BIFURCATION OF ISSUES AT TRIAL"** upon the following counsel of record, by depositing true copies thereof in the United States Mail, postage prepaid, on the 4th day of August, 2009:

Charles M. Love, III, Esq.
Bowles Rice McDavid Graff & Love
600 Quarrier St.
Charleston, WV 25301
*Counsel for Monsanto Company, et al*

David H. Carriger (WV Bar No. 7140)
The Calwell Practice, PLLC
Law and Arts Center West
500 Randolph Street
Charleston, WV  25302
304-343-4323
*Counsel for Plaintiff*